Arturo GONZALEZ, Jr. and Esperanza
Ochoa, Appellants,

v.

Domingo VILLARREAL and
Elma Garza, Appellees.

No. 13–07–00704–CV.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

Feb. 7, 2008.

Rehearing Overruled March 24, 2008.

Adam Poncio, Law Offices of Cerda & Poncio, San Antonio, Jaime Omar Garza, Alice, Jaime J. Munoz, San Juan, for appellants.

Ramon Garcia, Edinburg, Craig S. Smith, Corpus Christi, for appellees.

Before Chief Justice VALDEZ and Justices YAÑEZ and BENAVIDES.

## OPINION

Opinion by Chief Justice VALDEZ.

This is an accelerated appeal in an election contest. Appellants, Arturo Gonzalez and Esperanza Ochoa, appeal from the trial court's order voiding an election and ordering a new election in places four and five of the board of trustees for the La Joya Independent School District ("La Joya ISD"). By three issues, appellants argue that (1) the trial court erred in voiding the election, (2) there were no irregularities in the appointment of elections officials, and (3) the trial court erred in allowing testimony alleging a conspiracy because there was no corroborating evidence. We affirm.

## I. BACKGROUND

Arturo Gonzalez and Elma Garza were incumbent members of the La Joya School Board who sought reelection on the May 12, 2007 ballot. Gonzalez and Garza were members of different political camps. Gonzalez supported Esperanza Ochoa ("Contestees") in her campaign against Garza. Elma Garza supported Domingo Villarreal ("Contestants") in his bid against Gonzalez. The final election results revealed that Gonzalez garnered 2,624 votes against Villarreal's 2,303 and won by 322 votes.[1] Ochoa garnered 2,678 votes to Garza's 2,275, producing a 403 vote victory margin.

On June 15, 2007, Garza and Villarreal filed an election contest. They alleged, among other things, that La Joya school board members and administrators allowed unauthorized persons to serve as election judges and clerks ("election officials"). Contestants also alleged that election officials (1) allowed ineligible individuals to vote, (2) prevented eligible voters from voting, (3) improperly relocated voting machines, and (4) engaged in fraud. The allegations of fraud and appointment of an unauthorized election judge focus on an alleged conspiracy between other members of the school board and local political figures to rig the election by appointing a biased election judge. Contestants argue that in an otherwise very close district wide election, fraud is evidenced by the

---

1. The Contestants' petition is our only source for the total votes garnered by Gonzalez and Villarreal. Mathematically, it produces a 321 vote difference. Throughout the record, however, the victory margin between Gonzalez and Villarreal is testified to as 322.

lopsided outcome at polling sites in which an illegally appointed and biased election judge presided.[2]

Gonzalez and Ochoa answered with a general denial and a counter action for negligence and civil conspiracy. Additionally, Contestees sought sanctions and declaratory relief. After discovery and several pretrial hearings, a bench trial commenced on October 3, 2007.

Generally categorized, the evidence touches upon the (a) appointment of Aida Rivas as election judge, (b) testimony of Alejandra Rodriguez, an election clerk, (c) qualifications of certain election clerks, (d) voter registration rolls, combination forms, and provisional ballots, (e) testimony of Contestant Elma Garza, (f) evidence of an alleged conspiracy, and (g) evidence of the internal investigation into election code violations.

## A. Appointment of Aida Rivas as Election Judge

Sofia Villarreal, an administrator with the La Joya School District, and Irma Herrera, secretary to the La Joya School Board, testified regarding the appointment of Aida Rivas, the election judge who presided over early voting at Lloyd Bentsen Elementary and election day voting at E.B. Reyna Elementary.

As school board secretary, Herrera maintains the school board's agenda and minutes. In addition to Herrera's testimony, several school board agendas and minutes of school board meetings were admitted into evidence. Herrera testified that the school board appointed Irene Garcia as the early voting election judge for Bentsen Elementary and election day judge for Reyna Elementary on March 7, 2007.[3]

Garcia is an elected trustee of the South Texas Community College Board of Trustees. Because she is an elected official, Garcia could not serve as an election judge. TEX. ELEC.CODE ANN. § 32.052 (Vernon 2003). By a letter dated March 19, 2007, Garza and Domingo Villarreal notified Joel Garcia, then president of the school board, that Irene Garcia was statutorily disqualified from serving as an election judge. The record, however, does not contain any minutes, agendas, or formal directives rescinding Irene Garcia's appointment or appointing Rivas as election judge. Herrera did not testify as to how Rivas was ultimately appointed election judge.

Sofia Villarreal had no prior election administration experience. Nevertheless, Sofia Villarreal was designated the election administrator for the school board election and was in charge of conducting the election.[4] Sofia Villarreal testified that school board members recommended individuals to serve as election judges for particular polling sites and as election clerks and that John Alaniz, a school board member, recommended Aida Rivas.[5] The recommen-

2. The allegedly illegal and biased election judge presided over two polling sites. The tally for place four from those two polling sites is Gonzalez, 876, Villarreal, 540, producing a 336 victory margin at those polling places. The tally for place five is Ochoa, 885, Garza, 545, for a 340 margin of victory at those polling places.

3. Two alternate election judges were also appointed, but they later refused to serve. The record, however, is not clear as to when the two alternate election judges refused to serve.

4. The record is not clear as to how Sofia Villarreal was appointed as the school district's election administrator. The school board agendas and minutes from December 2006 through May 2007 do not show any formal board action taken regarding Sofia Villarreal's appointment. Rita Garza–Uresti, a school board member, testified that Sofia Villarreal was formally appointed by the school board.

5. John Alaniz is the Palmview City Manager and directly supervises Rivas, who is his secretary.

dations, however, were not formal board actions. On April 11, 2007, Sofia Villarreal wrote a note to Alda Benavides, superintendent of schools, notifying her that Rivas would serve as an election judge. The only official documentation of Rivas's authority to serve as an election judge is a letter from Sofia Villarreal to Rivas dated April 13, 2007.

Contestants argued that Villarreal's letter to Rivas is merely a notice of selection and does not properly evidence Rivas's appointment because there is no formal notice or hearing and because no public record exists of the election authority—the school board in this case—making the appointment. Contestees argued that the election judge's vacancy occurred within twenty days of the election, allegedly as evidenced by Villarreal's informal note to Benavides,[6] and that Rivas's appointment was made on an emergency basis without the need for public notice or hearing. Indeed, the record does not contain any formal action explaining how Rivas was appointed election judge or who was responsible for her appointment.

In an effort to have an outside authority administer the election, Contestant Elma Garza, a school board member, moved to have the Hidalgo County Election Administrator run the upcoming election at an April 25, 2007 school board meeting. Her motion was defeated by a vote of four-to-three. Joel Garcia, Elma Garza, and Joe Aguilar voted for the motion. Jose Salinas, Rita Garza–Uresti, Arturo Gonzalez, and John Alaniz voted against the motion. With the defeat of Garza's motion, the administration of the election rested in the school district's hands.

Early voting began on April 30, 2007, and Rivas served as election judge for early voting at Bentsen Elementary until May 8, 2007. Subsequently, Rivas served as election judge on May 12, 2007, election day, at Reyna Elementary and she was assisted by several election clerks.

## B. Testimony of Election Clerk Alejandra Rodriguez

Alejandra Rodriguez, a social acquaintance of Rivas, testified about her encounters with Rivas before and during the election. Rodriguez testified that Rivas engaged in improper activity by (1) engaging in pre-election conversations that evidence a bias towards Contestees' political camp, (2) allowing unregistered voters to vote, (3) failing to catalogue voters' addresses on required lists, known as combination forms,[7] and (4) giving preferential treatment to Contestees' supporters.

### 1. Pre–Election Conversations

Although Rivas was not officially notified of her selection as an election judge until April 13, 2007, Rivas asked Rodriguez in March of 2007, to serve as an election clerk for an election that Rivas was judging. Before the election, Rivas took Rodriguez to a political function where Rodriguez was introduced to Kino Flores, a local political figure. Rodriguez testified as to a conversation between Flores, Rivas, and herself:

> After I was introduced, she said-he said that I if was going to be [out]side [sic] working, and she said, no, that I[was] going to be inside, that she wanted me

6. Early voting began on April 30, 2007. As previously noted, Sofia Villarreal's informal note to Benavides is dated April 11, 2007.

7. A combination form is a sign-in sheet and affidavit used at polling places. It contains columns for a voter's precinct number, certificate number ("voter unique identification number," "VUID" or "registration number"), name, address, and signature.

inside. And then he said that if she had enough drivers to bring in voters. And she said, no, but I'll get them for you. And he asked me how many votes I was going to bring in, and I said 15.

Rodriguez worked as an election clerk under Rivas but was never administered an oath.

### 2. Votes by Unregistered Voters

Rodriguez testified that voters who were not on the registration rolls and did not have voter registration cards were allowed to vote with only their identification cards. According to Rodriguez, election officials were to call the election administration office to determine whether an individual was properly registered to vote if he or she was not on the registration rolls and did not have a voter registration card. Rivas, however, instructed Rodriguez not to do so. Rodriguez recounted that

> ... a lot of times, most of the times, Aida [Rivas] would tell me that county was taking too long and for me to go ahead and add them because she knew them and they were good voters. And I would tell her, like, county hasn't confirmed and they don't have voter registration card[s], and she would shut me up quickly. I'm going to quote her. I'm not asking for your opinion. You do as I say here. So I would add them on [to the voter registration rolls].

Rodriguez testified that these individuals whose names did not appear on the voter registration rolls and who could not produce voter identification cards were added to the voter registration rolls by hand, signed into the combination forms, and were allowed to vote on the voting machines.

### 3. No Addresses on Combination Forms

The record contains combination forms for April 30, 2007, which reveal that none of the voters on the list for that date have corresponding addresses, but do contain precinct and voter registration numbers. Contestants argued that the vast majority of individuals who voted at Rivas's polling site on April 30, 2007, were allowed to vote on the machines without a proper record being made of their eligibility to do so.[8] They concluded that without corresponding addresses, a voter's eligibility cannot be ascertained from a review of the combination forms.

When asked about the absence of addresses on the combination forms, Rodriguez testified that "I was instructed by Mrs. Rivas not to [write down addresses] because it was going to take more time and we were shorthanded." Contestants contend that Rivas's dereliction contributed to the counting of illegal or ineligible votes and evidenced a conspiracy to perpetrate fraud on La Joya voters. As discussed below, the disheveled election records make the propriety of votes difficult to ascertain.

### 4. Preferential Treatment & Suspect Motives

Rodriguez testified that Rivas would give preferential treatment to the Contestees' supporters. For example, when Contestees' supporters would mistakenly enter the polling place, Rivas would nicely tell them to leave, while Contestants' supporters were rudely told to "get out." Additionally, Rodriguez testified that Rivas would manipulate voters into allowing her to assist them in voting.[9] Voters who pre-

---

8. Only a handful of voters listed on the suspect combination lists voted provisionally. The vast majority, at least as evidenced by the combination lists, voted without any restrictions.

9. Generally, a voter who is physically disabled or unable to read is eligible to receive assistance in marking the ballot. TEX. ELEC.CODE ANN. § 64.031 (Vernon 2003).

sented themselves with voting assistants known to support the Contestees proceeded through the sign-in and voting process undisturbed. Voters who presented themselves with voting assistants known to support the Contestants were confronted with exacting questions. Rodriguez averred, "[Rivas] would tell the voters, you need assistance, right[?] And they would reply, yes. And then, like, I can help you if you like or do you want [your assistant] to help. You know, she was in their face already, and they would say, oh it doesn't matter, and she would assist them."

Two other individuals testified that election workers at Bentsen Elementary favored Gonzalez and Ochoa. First, Irma Pena testified that Rivas told her to vote for the people with the "little buses."[10] Dora Saenz testified that a female election worker voted for her and that she did not press any buttons. She did not get the election worker's name, but she testified that she wanted to vote for Villarreal and Garza. She also filed a complaint with the La Joya ISD police.

Alejandro Perez, a La Joya ISD police officer, and Sofia Villarreal received numerous complaints from both political camps regarding Rivas, and investigated the situation. According to Rodriguez, the complaints agitated Rivas. Rodriguez described Rivas's reaction to the stress of the investigations:

She told me—because I got upset with her. She had yelled at me, and I told her not to be doing that in front of the voters, that I wasn't going to permit that. So she yelled at me once again, and I got up and left my post, and she told me that she was sorry but that she was under a lot of stress because there was people—that's how she said it—that wanted—wanted her out of there. And she said, but I'm not worried about it.

There's a lot of stress. I'm not worried because Kino Flores has my back. And I told her, I don't care who he is, you don't yell at me. That's [sic] it's not okay for you to yell at me because you are under stress.

Rodriguez concluded her testimony by stating that in her eyes, Rivas's preferential treatment of some voters affected the outcome of the election.

## C. Qualifications of Certain Election Clerks

Several election clerks testified regarding their appointments and qualifications. Gloria Amador testified that her sister-in-law supported Contestees and that during early voting, she would assist voters who wanted to vote for Contestees. While Amador was waiting outside Bentsen Elementary, Rivas approached and asked her if she wanted to be an election clerk. Amador understands English and "can read it a little bit." She testified that as an election clerk, she witnessed hundreds of names added to the voter registration rolls because they were cleared by the Hidalgo County Elections Administration. Thus, there is a contradiction between Rodriguez's and Amador's testimony about whether voter names were properly added to the registration list. After the election, Amador began employment as a bus driver for the La Joya School District.

Max Montelongo was an early voting election clerk, but on election day he transported voters to the polls so that they could vote for Contestees. Montelongo testified that Rivas found him standing in the Bentsen Elementary parking lot and asked him to be an election clerk. Montelongo agreed, even though he does not understand English and cannot read or write. Aleida Cruz, a poll watcher, testi-

10. Gonzalez and Ochoa's platform was pro-busing. They campaigned on little yellow school buses and were colloquially known as "los bosesitos."

fied that Montelongo exclaimed to Rivas, "Irene sent me," when he walked into the Bentsen Elementary polling place.[11] There was, thus, a contradiction in testimony regarding how and who selected Montelongo to be an election clerk.

Linda Tijerina testified that Irma Herrera called her and asked if she would be an election clerk. She served as an election clerk at Bentsen Elementary. Tijerina does not understand English.

### D. Voter Registration Rolls, Combination Forms, and Provisional Ballots

In addition to the testimony of how election officials conducted themselves, numerous voter registration rolls[12] and combination lists were admitted. They are organized by precinct number and contain an alphabetized list of individuals' names, voter registration numbers, addresses, and dates of birth. The rolls are printed by the County Election Administrator and delivered to local election officials for use during the election. Also admitted were numerous combination forms used at Bentsen Elementary, Reyna Elementary, and the Sullivan City fire station polling sites.[13]

In addition to the registration rolls and combination lists, there was testimony about other documentation used in the election. Teresa Navarro, the Hidalgo County Elections Administrator, testified that her office maintains an online database of registered voters. Any individual with access to the Internet can ascertain a voter's registration with the voter's identification number or name. Simply searching for an individual's name in the database, however, results in a list of registered voters with that identical name. The result is the same if one physically searches the printed registration rolls. In order to specifically identify an individual voter, one needs the voter's identification number or address.

There was evidence regarding the handling of provisional ballots. Admitted into evidence are copies of opened and unopened provisional ballot envelopes. According to Navarro, a ballot board determines the propriety of a provisional ballot; opened provisional ballot envelopes are counted, and unopened envelopes are not counted. Navarro testified that there were twenty-five provisional ballots from qualified voters that were not counted. Navarro further testified that there were thirty-eight provisional ballots of ineligible voters that were counted.

### E. Testimony of Elma Garza

Contestant Elma Garza, a librarian for a Rio Grande City middle school and an incumbent in one of the races, examined the combination forms and compared them to the online database of registered voters. Generally, Garza testified that because of missing addresses or deficient voter identification numbers, she was not able to ascertain the eligibility of 208 voters who voted on April 30, 2007 at Bentsen Elementary ("unascertainable voter list 1") and of 97 voters who voted early at the Sullivan City fire department ("unascertainable voter list 2"). She further testified that based upon her comparison of the election day combination forms for Reyna

11. The only reference in the record to an "Irene," is Irene Garcia, the originally appointed and statutorily disqualified election judge.

12. The voter registration rolls constitute forty-seven exhibits and many are hundreds of pages long.

13. As previously noted, April 30, 2007 early voting combination forms for Bentsen Elementary do not contain voter addresses.

Elementary, she found 211 voters that she alleged were illegal ("illegal voter list").[14]

As Garza began testifying about the first name on the illegal voter list, Contestees objected. They argued that Garza could not establish the factual issues related to ascertaining an individual's residency based upon only a review of the online voter registration rolls. Contestees, therefore, argued that Garza could not provide reliable testimony regarding a voter's eligibility to vote. According to Contestees, each voter should have been subpoenaed to court for examination by counsel and a determination by the court of eligibility.

Perhaps in response to Contestees' repeated objections, Garza did not testify line-by-line as to the problems with each individual voter. Instead, she created two lists of voters whose eligibility could not be ascertained and one list of voters who allegedly voted illegally. Garza's three lists were admitted without objection, but with the understanding that they represented only allegations.

### 1. Voters whose Eligibility could not be Ascertained

Garza testified that she examined the early voting combination lists for Bentsen Elementary and the Sullivan City fire department. As already noted, those lists do not contain voter addresses. Garza attempted to ascertain the eligibility of each voter by entering the voter's name or registration number into the database of registered voters. In some instances, the voter identification number was deficient.

According to Garza, if an individual's name was searched on the online database and the search produced multiple results—none of which matched the identification number on the combination form—then that voter's eligibility was unascertainable. Garza, in "unascertainable voter list 1," concluded that there were 208 voters who voted at Bentsen Elementary on April 30, 2007, whose eligibility could not be ascertained. She also concluded, in "unascertainable voter list 2," that there were 97 voters who voted at the Sullivan City fire department on the same day whose eligibility could not be ascertained.

### 2. Illegal Votes

Through her testimony, Garza alleges that 218 illegal votes were counted. Garza alleged that those votes were illegal because the names of 127 individuals who actually voted in the election did not appear in the online database that she searched. Garza's comparison of the online database to the combination lists also revealed 72 voters who voted in the election that were registered in the database, but whose database file shows that they do not reside in the La Joya School District. Garza also found that the names of four voters did not match their voter identification number and that five voters voted in the wrong precinct on election day.

### F. Testimony of Aida Rivas and Evidence of Alleged Conspiracy

Aida Rivas testified regarding her involvement with the election. She claims

**14.** Contestees strenuously objected to Garza's testimony on three grounds. First, Contestees claimed that Contestants shielded the lists from discovery by asserting the attorney work product privilege during depositions, but then offered them as evidence at trial. Contestees argued that the lists were inadmissible at trial because such an admission would be an abuse of the discovery process. Second, Contestees argued that Garza was not qualified to determine a voter's eligibility or legality to vote. They argued that the proffered lists should be excluded. The trial court took judicial notice of the election code and voting requirements. The third objection is outlined in the body of this opinion. As discussed in section III below, Contestees' evidentiary objections have been abandoned on appeal.

that she was notified a week or two before the election that she had been selected as an election judge. She did not know how Gloria Amador and Linda Tijerina were appointed to be election clerks. Rivas testified that they just showed up. Regarding the selection of Montelongo to be an election clerk, Rivas testified that she found him in the parking lot while she was taking a bathroom break and asked him to serve as an election clerk because they were swamped. Rivas did not know that Montelongo could not read, write, or speak English.

Admitted into evidence were the mobile phone records of Rivas, John Alaniz, Rita Garza–Uresti, and Irene Garcia. The records reveal that numerous phone calls were made between Rivas and Alaniz during the election period. Alaniz is a La Joya School Board member and the city manager for Palmview; he is also Rivas's boss. Alaniz could not recall the nature of the phone calls. Rivas, however, vividly recalled that the phone calls were related to an engineer doing business with the City of Palmview.

Rivas, in deposition testimony, denied ever calling Rita Garza–Uresti, a school board member who supported Contestees, during the election. However, at trial Rivas testified that she called Uresti to request soup because she was sick to her stomach. Uresti testified that Rivas might have called her, but she could not remember.

A final piece of alleged conspiracy evidence is Rivas's phone log for May 4, 2007 at 6:00 p.m. After the polls had closed during an early voting day, Rivas called Alaniz, Irene Garcia, Jorge Garcia, Kino Flores, and Rita Garza–Uresti. Rivas could not recall why she called those individuals in that order within a few minutes of each other. Rivas concluded her testimony by stating that although some mistakes were made, she ran a fair election.

Having presented testimony and records that alleged a conspiracy to rig the election, Contestants rested.

## G. Evidence of an Internal Investigation

Contestees' evidence came largely from the testimony of Alejandro Perez, a La Joya ISD police officer, and Raul Gonzalez, chief of La Joya ISD police. Perez testified that he investigated complaints from both political camps during the election. He interviewed Dora Saenz, who claimed that Rivas assisted her in voting, that she wanted to vote for Villarreal, and that Rivas cast her vote for Gonzalez instead. Officer Perez also spoke with Alejandra Rodriguez, who stated to him that Rivas was fair but rude.

Chief Gonzalez testified that he found no evidence of fraud in the election. During the course of investigating polling place complaints, he reviewed an affidavit executed by Dora Saenz, which stated that Rivas had cast Saenz's vote contrary to her intent. Chief Gonzalez also interviewed Cesria Aranda, whose complaint was that Rivas would not allow her to enter the polling place with an assistant. Contestees rested after Chief Gonzalez's testimony.

## H. Conclusion of Trial

Both parties presented motions for directed verdict before closing arguments. On October 19, 2007, the trial court orally rendered judgment in favor of Contestants. The written judgment, signed on October 29, 2007, states that the trial court found that Contestants proved "by clear and convincing evidence that illegal votes were counted, that officials failed to count some legal votes and that election judges engaged in fraud and illegal conduct and made mistakes...." Contestees did not request findings of fact or conclusions of

law and none were filed. Contestees filed a notice of appeal on November 13, 2007. This appeal was accelerated and briefing concluded on January 22, 2008. *See* TEX. ELEC.CODE ANN. § 232.015 (Vernon 2003) (providing that an appellate court may accelerate an appeal in a contest of a general election).

## II. SCOPE OF TRIAL COURT'S INQUIRY

■■■ To overturn an election, an election contestant must demonstrate by clear and convincing evidence that "voting irregularities materially affected the election results." *Tiller v. Martinez,* 974 S.W.2d 769, 772 (Tex.App.—San Antonio 1998, pet. dism'd w.o.j.). The focus of the trial court's inquiry, as dictated by the election code, is to attempt to determine the true outcome of the election, if possible:

(a) The tribunal hearing an election contest shall attempt to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because:

(1) illegal votes were counted; or

(2) an election officer or other person officially involved in the administration of the election:

(A) prevented eligible voters from voting;

(B) failed to count legal votes; or

(C) engaged in other fraud or illegal conduct or made a mistake.

TEX. ELEC.CODE ANN. § 221.003(a) (Vernon 2003).

In this case, the trial court's order tracks the language of the statute. The trial court found that Contestants "proved by clear and convincing evidence that illegal votes were counted, that officials failed to count some legal votes and that the election judges engaged in fraud and illegal conduct and made mistakes all of which materially affected the outcome of the

election and as a result the Court cannot ascertain the true outcome of the election." Accordingly, the trial court declared the election void and ordered a new election.

## III. CONTESTEES' FIRST ISSUE

By their first issue, Contestees' assert that the trial court erred in overturning the election results. Contestees contend that the evidence is legally insufficient to support the trial court's judgment. They argue that Elma Garza's testimony regarding her comparison of the combination lists and online voter registration database is no evidence because (1) it was testimony admitted over objections and (2) the residency of each challenged voter was not established by the lists of allegations that Garza compiled. Contestees specifically argue that:

Contestants presented three main exhibits to establish illegal and/or improper votes, [unascertainable voter lists 1 and 2, and illegal voter list]. Ms. Garza, a Contestant in this case, testified she prepared the exhibits. Objections were made based on the hearsay nature of the exhibits, lack of foundation and Ms. Garza's improper expert testimony. Regardless, she admitted that she could not establish one way or the other whether the voters listed in [unascertainable voter lists 1 and 2] were eligible to vote in La Joya ISD or Hidalgo County on the date of election. She admitted she made no attempt to interview any of the voters and none were brought in to testify. She wholly failed to establish in which particular election contest that the alleged voters voted or how their votes would have affected the outcome of the election. The list regarding any voter listed on [unascertainable voter lists 1 and 2], therefore, constitute no evidence and the lists are of no value.

With regard to [the illegal voter list], Ms. Garza again admitted she had not spoken to any voters regarding their residency and none of the voters on the list were called in by contestants to testify regarding their status and the list (two separate voters were called in to testify but questions were not made regarding their volition, intent and action). In fact, the only witness called in from the list were stipulated to by Contestants, admitting they were qualified to vote in La Joya ISD, Hidalgo County and were otherwise qualified to vote on the day of the elections. [The illegal voter list] is essentially of no value to Contestants and they have not established that the voters were not eligible to vote, in which election contest they voted, nor how their votes affected the outcome of the election.

BRIEF OF APPELLANT at 21–22, *Domingo Villarreal and Elma Garza v. Arturo Gonzalez and Esperanza Ochoa*, No. 13–07–704–CV (Tex.App.—Corpus Christi, Jan. 14, 2008).

■ We find that Contestee's first argument, in which they contend that Garza's testimony was admitted over objection, is advanced without a single citation to any legal authority. Because Contestees' argument is merely a bald assertion of objections made to the trial court without any citations to the record or legal authority;[15] it is inadequately briefed and, therefore, waived. TEX.R.APP. P. 38.1(h) (providing that the brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983).

■ By their second argument, Contestees' invite us to employ a *de novo* review of the residency of each individual voter that Contestants alleged were ineligible or illegal and to reverse the trial court's judgment because Contestants did not present clear and convincing evidence as to each voter's residency. We decline to do so because Contestees have failed to present us with any authority, nor have we encountered any, to suggest that any standard other than abuse of discretion is appropriate in an appeal from a trial court's judgment in an election contest. TEX.R.APP. P. 38.1(h).

Contestees' remaining argument, as we understand it, is the legal sufficiency prong of the abuse of discretion test.[16] We will, therefore, detail (a) the abuse of discretion standard of review, and (b) the prism through which we will review the evidence in determining whether the trial court abused its discretion.

**A. Standard of Review: Abuse of Discretion**

The trial court's determination in this case is due a certain amount of respect. As we have previously held, we must review a judgment in an election contest to determine whether the record shows that the trial court abused its discretion. *Guerra v. Garza,* 865 S.W.2d 573, 576 (Tex. App.—Corpus Christi 1993, writ dism'd

---

**15.** We also note that Contestees have failed to cite for us, and the reporter's record does not readily reveal, the trial court's rulings on Contestees' numerous objections to Elma Garza's testimony. TEX.R.APP. P. 33.1(a)(c)(A) (providing the procedure for preservation of error); 38.1(h).

**16.** In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion? *See generally, Lindsey v. Lindsey,* 965 S.W.2d 589, 592 (Tex. App.—El Paso 1998, no pet.).

w.o.j.); *Reese v. Duncan,* 80 S.W.3d 650, 655 (Tex.App.—Dallas 2002, pet. denied).

A trial court commits an abuse of discretion if its decision is so arbitrary and unreasonable that it rises to the level of a clear and prejudicial error of law. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992). In reviewing a court's factual determinations for an abuse of discretion, we may not substitute our judgment for that of the trial judge. *Id.* We give a great deal of deference to the trial court, as the trier of fact, in its determination of both the credibility of the witnesses and the weight of their testimony. *Slusher v. Streater,* 896 S.W.2d 239, 245 (Tex.App.—Houston [1st Dist.] 1995, no writ); *Green v. Reyes,* 836 S.W.2d 203, 212 (Tex.App.—Houston [14th Dist.] 1992, no writ). Moreover, the trial court possesses the discretion to resolve any conflicts arising from the evidence. *Alvarez v. Espinoza,* 844 S.W.2d 238, 246 (Tex.App.—San Antonio 1992, writ dism'd w.o.j.). Consequently, we may not overturn the trial court's judgment unless it is apparent from the record that the trial court could have reached only one result. *Walker,* 827 S.W.2d at 839–40; *Tiller,* 974 S.W.2d at 777.

■ On review of a judgment rendered after a non-jury trial, if findings of fact or conclusions of law are neither filed nor requested, the reviewing court will imply all necessary findings of fact to support the judgment. *Cadle Co. v. Ortiz,* 227 S.W.3d 831, 834 (Tex.App.—Corpus Christi 2007, pet. filed). When a reporter's record is presented on appeal, the legal and factual sufficiency of the implied findings may be challenged as if they were jury findings or a trial court's findings of fact. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002); *Roberson v. Robinson,* 768 S.W.2d 280, 281 (Tex.1989).

## B. Legal Sufficiency Review

A legal sufficiency review of a finding for which the burden of proof at trial was clear and convincing evidence must necessarily take into consideration the higher evidentiary burden imposed by the "clear and convincing" standard of proof. *In re J.F.C.,* 96 S.W.3d 256, 265–66 (Tex.2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* at 264. "Our legal sufficiency review, therefore, must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof." *Id.* at 265–66.

The supreme court has explained the prism through which we must view the record in a legal sufficiency review of this type as follows:

The distinction between legal and factual sufficiency when the burden of proof is clear and convincing evidence may be a fine one in some cases, but there is a distinction in how the evidence is reviewed. In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable fact-

finder could have disbelieved or found to have been incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*Id.* at 266 (emphasis in original). With these principles in mind, we now turn to the law and the evidence.

## C. Legal and Illegal Votes

Contestees argue that Elma Garza's testimony is no evidence that illegal or ineligible votes were cast or that mistakes were made so as to render the election's outcome undeterminable. The trial court took judicial notice of the election code and of voter eligibility requirements. We outline the law and its application to the instant facts below.

### 1. Applicable Law

To be eligible to vote in an election, a person "must be a qualified voter on the day the person offers to vote; be a resident of the territory covered by the election; and satisfy all other requirements for voting prescribed by law." *Slusher*, 896 S.W.2d at 247 (citing TEX. ELEC.CODE ANN. § 11.001 (Vernon 1986)). "A qualified voter is one who is 18 years of age or older; is a United States citizen; has not been determined mentally incompetent; has not been finally convicted of a felony, except under certain circumstances; is a resident of this state; and is a registered voter." *Id.* (citing TEX. ELEC.CODE ANN. § 11.002 (Vernon 1986)).

An "illegal vote" is one that "is not legally countable." TEX. ELEC.CODE ANN. § 221.003(b) (Vernon 2003). For example, a vote cast in a precinct by a person who does not reside in the county of the election is an illegal vote that cannot be counted. *Alvarez*, 844 S.W.2d at 247 ("As a matter of law, the other six voters were

nonresidents, who should not have voted in this precinct three election."). Additionally, a vote cast in a precinct by a person who resides in the county but does not reside in that precinct is an illegal, uncountable vote. TEX. ELEC.CODE ANN. § 11.003 (Vernon 2003) ("Except as otherwise provided by this code, a person may vote only in the election precinct in which the person resides."); *Harrison v. Jay*, 153 Tex. 460, 271 S.W.2d 388, 389 (1954) (citing statutory predecessor to section 11.003 and holding that "[w]hen a voter leaves his own polling place to vote at a polling place not used by the voting residents of his own residence district, his ballot has not been allowed to count."); *Medrano v. Gleinser*, 769 S.W.2d 687, 689 (Tex.App.—Corpus Christi 1989, no writ) (sufficient evidence of illegal votes existed where voters voted in a precinct in which they did not live); *Zuniga v. Almaraz*, 514 S.W.2d 331, 334 (Tex.Civ.App.—San Antonio 1974, no writ) (trial court properly refused to count vote cast in wrong precinct); *Boroughs v. Williamson*, 312 S.W.2d 717, 721 (Tex.Civ.App.—El Paso 1958, writ dism'd) (holding that even though voters held a good faith belief that they voted in correct precinct, their votes were illegally counted because they, in fact, voted in the wrong precinct).

### 2. Application of Law to Facts

As stated above, Garza identified four categories of illegal votes that were cast during the course of the election. First, she testified that 127 voters' names and identification numbers listed on the combination forms do not appear on the online voter registration database. Second, she stated that 72 voters listed on the combination forms are registered voters but, according to the online database, do not reside in the La Joya School District. Third, she testified that with respect to four voters, the names and registration

numbers provided on the forms did not match. Finally, she alleged that five voters voted in the wrong precinct.

■■■ The second (72 voters) and last (5 voters) categories can be readily addressed. As stated above, to be eligible to vote in an election, a person must be a "resident of the territory covered by the election." *Slusher*, 896 S.W.2d at 247 (citing TEX. ELEC.CODE ANN. § 11.001); *Alvarez*, 844 S.W.2d at 247. The 72 voters who cast their vote in the La Joya School District election but who did not reside in the La Joya School District clearly were not eligible to vote, and their votes were legally uncountable. Additionally, it is beyond dispute that a voter must vote in the proper precinct on election day; if not, the vote is legally uncountable. TEX. ELEC.CODE ANN. § 11.003 ("Except as otherwise provided by this code, a person may vote only in the election precinct in which the person resides."); *Harrison*, 271 S.W.2d at 389. Thus, Garza's testimony that five voters voted in the wrong precinct on election day establishes that those votes were not legally countable.

■■■ Garza's testimony in the trial court was largely undisputed. In fact, Contestees neither presented any evidence to the trial court that Garza's calculations were incorrect, nor did they cross-examine her as to each name on her list of allegations. Contestees rested their entire evidentiary examination of Garza's list on their argument that the list was merely a set of allegations and did not represent a proven violation of the election code. Accordingly, the trial court was entitled to rely on this testimony and the corresponding exhibits to form a firm belief or conviction in the truth of the allegation that at least 77 votes cast on election day were illegally counted.

### 3. Evidence Outside the Appellate Record

■■■ In their reply brief to this Court, Contestees have submitted charts which they implicitly contend demonstrate that some of these voters were in fact residents of the district and voted in the proper precinct. However, Contestees did not present such evidence to the trial court. In other words, Contestees presented no evidence disputing Garza's numbers. Under these circumstances, we cannot credit Contestees' untimely calculations and their implicit request that we perform our own cross-examination of Garza's calculations.[17] It was reasonable for the trial court to credit Garza's testimony given the complete absence of any dispute regarding the same before the trial court. Accordingly, legally sufficient evidence supports the trial court's implied finding that 77 votes were illegally cast.

With respect to the remaining categories of illegal votes, we find that they are more properly categorized as mistakes made by the election clerks, which clouded the true outcome of the election. We now turn to a discussion of those issues.

### D. Votes Cast After Recording Mistakes Were Made

■■■ The election code does not require a trial court to rely solely on "illegal votes" in attempting to ascertain the true outcome of an election. As is evident from section 221.003, the outcome of an election can be muddled not just by the counting of

---

**17.** Texas Rule of Appellate Procedure 38.1(f) requires appellate briefs to contain a statement of facts that is supported by record references. *See* TEX.R.APP. P. 38.1(f); *Burke v. Ins. Auto Auctions*, 169 S.W.3d 771, 775 (Tex. App.—Dallas 2005, pet. denied). An appellate court cannot consider documents cited in a brief and attached as appendices if they are not formally included in the record on appeal. *See Burke*, 169 S.W.3d at 775; *Green v. Kaposta*, 152 S.W.3d 839, 841 (Tex.App.—Dallas 2005, no pet.).

illegal votes or the failure to count legal votes, but also by mistakes made by election officers. TEX. ELEC.CODE ANN. § 221.003(a)(2)(C) (Vernon 2003); see Alvarez, 844 S.W.2d at 242. A contestant may allege and prove that "irregularities rendered impossible a determination of the majority of the voters' true will." *Guerra,* 865 S.W.2d at 576.

 The language used in the election code regarding mistakes is obviously broad and could be read to include all sorts of election code violations. Courts must be mindful, however, that noncompliance with the strict requirements of the election code in many instances will not undermine the outcome of an election. For example, in *Honts v. Shaw,* the Austin Court of Appeals determined that election officials violated section 43.001 of the election code by joining nineteen election precinct polling places. *Honts v. Shaw,* 975 S.W.2d 816, 821 (Tex.App.—Austin 1998, no pet.). The court of appeals, however, held that the violation did not justify an order setting aside the election. *Id.* Specifically, it held that the provisions violated were merely directory and did not affect the legality of the votes cast at the illegally combined precincts because there was no evidence that the resulting election was unfair. *Id.* at 821–824. In doing so, the court noted that

> [t]he purpose of the [Election] Code is to prohibit error, fraud, mistake, and corruption, and yet it may not be used as an instrument of disenfranchisement for irregularities of procedure. Since the will of the legal voters as expressed at the polls is the matter of paramount concern, and, in the absence of any showing of fraud, or reasonable indication that such will has not been fairly expressed and the evidence thereof properly preserved, the courts have been liberal in construing and enforcing as directory only the provisions of the

election laws which are not upon their face clearly mandatory.

*Id.* at 821 (quoting *Prado v. Johnson,* 625 S.W.2d 368, 369–70 (Tex.Civ.App.—San Antonio 1981, writ dism'd w.o.j.)).

 We quote the above language not merely to demonstrate that certain violations of election code provisions may not undermine the outcome of an election, but also to demonstrate that some, in fact, may. The purpose of the election code is to ensure that the true will of the voters is "fairly expressed" and that the evidence of that expression is "properly preserved." *Prado,* 625 S.W.2d at 369–70.

1. *Applicable Law: Responsibilities of Election Officials*

There are many provisions contained in the election code that demonstrate the code's purpose to preserve evidence of the qualified voters' true will. Although no court has expressly addressed these issues in connection with an election contest, we believe that violations of certain recording provisions by election clerks can certainly undermine the purpose of the election code and obscure the true will of the qualified voters. By necessity, election officials are required to obtain and record certain information from individuals who present themselves at a polling place to vote. Election officials, under the code, are provided with certain tools with which they can verify information provided by a voter. We will discuss each of these in turn, as they are relevant to our inquiry.

First, before early voting begins, the registrar for the county prepares a list for each precinct of the registered voters in the precinct who will be eligible to vote in the election (the "registration list or registration rolls"). TEX. ELEC.CODE ANN. § § 18.001(a), 18.002, 18.003, 18.004 (Vernon 2003). The registration list contains the voters' names, residence addresses,

dates of birth, and registration numbers, and is organized alphabetically by voter name. *Id.* § 18.005 (Vernon Supp.2007). These lists are provided to the election officials conducting the election and are used during early voting and on election day to help identify qualified voters. *Id.* § 18.006 (Vernon 2003).

Second, an election clerk must also maintain a signature roster at the polling place, which a voter must sign upon being accepted for voting and before actually casting a vote. *Id.* § 63.002 (Vernon 2003). Third, the election clerk must maintain a poll list. *Id.* § 63.003 (Vernon 2003). After a voter is accepted and signs the signature roster, the election clerk must also enter the voter's name on a poll list in the same order in which the voter appears on the signature roster. *Id.*

Finally, the election code further specifically requires that election officers maintain a "registration omissions list" as follows:

(a) A registration omissions list shall be maintained by an election officer at the polling place.

(b) With respect to each voter who is accepted for voting but whose name is not on the list of registered voters for the precinct in which the voter is accepted, the election officer shall record:

(1) the voter's name, residence address, and voter registration number, if known; and

(2) a notation of the section of this code under which the voter is accepted that provides for accepting voters who are not on the list.

*Id.* § 63.005 (Vernon 2003). The secretary of state, however, can prescribe forms that combine the poll list and the signature roster or any other form required to facilitate this process of identifying voters. *Id.* § 63.004 (Vernon 2003).

When a combination form is used, as was done in the election under review, each line of the form contains multiple spaces for the information that must be provided and/or recorded when a voter is accepted for voting. For example, the combination form used in this election includes spaces for (1) the precinct number of the voter; (2) the voter's registration certificate number; (3) the poll list where the election clerk inserts the name of the voter; (4) the voter's address, to be filled in by the election clerk in case of an omission issue; and (5) a space for the voter's signature to satisfy the signature roster requirement. Additionally, several columns are provided that are identified by the section of the election code under which a particular voter is allowed to vote—in other words, an omissions list. For example, the columns in the combination form used in this election included (1) voters not on the registration list but allowed to vote under section 63.006; (2) voters with an incorrect certificate allowed to vote under section 63.007; (3) voters without a voter registration certificate who are not on the registration list and who are accepted for voting under section 63.009; and (4) voters who cast a provisional ballot under section 63.011.

Under ideal circumstances, an individual voting in person will present a certificate showing that he is registered to vote in the territory covered by the election, and his name will appear on that particular precinct's list of registered voters. *Id.* § 63.001(a)-(d) (Vernon 2003). An individual who presents himself at the polling place with a registration certificate and whose name appears on the list of registered voters for the precinct of the polling place will be accepted for voting. *Id.* § 63.001(d). The voter signs the signature roster, the election clerk inserts the voter's name on the poll list, and the election clerk must note on the registration list that the voter was accepted. *Id.* § 63.001(e).

### 2. Application of Law to Facts

As stated above, Garza testified that 127 voters' names and identification numbers listed on the combination forms do not appear in the online voter registration database, and that with respect to four voters, the names and registration numbers provided on the forms did not match. Additionally, during early voting, 208 voters presented themselves and voted at Bentsen Elementary, but these voters' eligibility to vote could not be ascertained because there were no addresses on the combination forms. Garza testified that she could not ascertain the eligibility of an additional 97 voters who voted during early voting at the Sullivan City fire department. This does not mean that these voters necessarily voted illegally; however, the failure to include other identifying information—mainly addresses—in the combination form makes it impossible to tell whether these voters legally cast their votes. The sum of 127, 208, 97, and 4 is 436. We next discuss the statutory safeguards that are in place that should have made ascertaining the eligibility of these 436 voters readily apparent from the face of the record.

### E. Statutory Safeguards

The election code provides for the many problems that can arise when a voter presents for voting under less than the ideal circumstances noted above. First, a voter may arrive with a voter registration certificate but the election clerk cannot locate that person on the registration list. *Id.* § 63.006 (Vernon 2003). Such a voter may be accepted for voting, but certain procedures must be followed to document that person's acceptance. *Id.* The voter must sign the signature roster and that person's name must be entered on the poll list by the election clerk, as with any voter. The election clerk must also write down the residence address and the voter registration number, if known, on the omissions list. *Id.* § 63.005(b) (Vernon 2003). Finally, the election clerk must also note on the poll list that the person was allowed to vote under section 63.005, and the combination forms provide a box that may be checked to note that the voter was accepted under these conditions. *Id.*

Second, a voter may arrive with an incorrect certificate, i.e. showing that the voter is registered in a different precinct than that of the polling place, and may also not appear on the precinct's list of registered voters. *Id.* § 63.007 (Vernon 2003). These voters may be accepted for voting but must execute an affidavit stating that the voter is a resident of the precinct, is entitled to vote, and did not deliberately falsify the information that the voter provided to the registrar. *Id.* § 63.007(a). However, the election clerk must note on the combination form that the voter was accepted under this section and enter on the omissions list the precinct of the voter's registration as indicated by the voter's registration certificate, as well as include the person's address within the precinct. *Id.* §§ 63.005; 63.007(b).

Finally, a voter may arrive at the precinct without a registration certificate and whose name does not appear on the list of registered voters. *Id.* § 63.009(a). When this occurs, the election clerk is authorized to contact the registrar to determine if the voter is registered. *Id.* § 63.009(b). If the registrar confirms that the person is registered, the voter may be accepted for voting once he presents proper identification. *Id.* However, the election clerk is required to note on the combination form that the voter was accepted under section 63.009(b) and must also fill out the omissions list information. *Id.* If, however, the election clerk cannot determine from the registrar that the voter is actually registered to vote, the voter may be accepted for *provisional voting,* which means that the voter casts a special, paper ballot

that is kept separate from the machines used for regular voting. *Id.* §§ 63.009(a); 63.011 (Vernon Supp.2007). The election clerk must note on the combination form that the voter cast a provisional ballot.

### F. Election Officials' Failure to Follow Statutory Safeguards

 Garza testified that with respect to 127 voters who cast their votes on election day, the names or registration certificate numbers could not be located on the list of registered voters, either because the name did not appear on the list at all or because there were multiple, identical names on the list that may or may not be the voter. Thus, although these voters could have been properly allowed to vote, some may have been required to vote provisionally. Without other identifying information, it is impossible to tell if these votes were legally cast. Additionally, Garza testified that four voters on election day voted, but provided an incorrect voter registration number. As for these voters, an address was not provided. Without more information, it is impossible to tell if these voters were qualified and properly accepted for voting, or whether they have been required to cast a provisional ballot.

With respect to voting during early voting, the same problems arose. Garza testified that for the same reasons—the lack of an address on the combination forms and the inability to match a particular voter with a particular listing on the online database—she could not determine the eligibility of 208 voters from the Bentsen Elementary polling place and 97 voters at the Sullivan City fire department polling place. These voters either were legally accepted or should have been provided a provisional ballot—without the required information on the combination forms, it is impossible to tell.

Moreover, Alejandra Rodriguez testified that on April 30, 2007, Rivas did not allow the election clerks to record voters' addresses on the combination forms, insisting that the voters be allowed to proceed to the machines because they were "good voters." Rivas also allowed voters who were not on the registration list and who presented without a voter identification card to vote, without first verifying the voter's eligibility with the county elections administration office. Those voters' names were handwritten onto the voter registration rolls, again, without verification from the elections administration office. Rodriguez's testimony of election officials' mistakes corroborates the combination lists used in creating Garza's list of illegal and unascertainable voters.

In their reply brief to this Court, Contestees have submitted charts which they implicitly contend demonstrate that Contestees were able to ascertain the eligibility of some of these voters. However, Contestees did not present such evidence to the trial court. In other words, Contestees presented no evidence disputing Garza's numbers. As stated above, we cannot credit Contestees' untimely calculations and their implicit request that we perform our own cross-examination of Garza's calculations.

It was reasonable for the trial court to credit Garza's testimony given the complete absence of any dispute regarding the same before the trial court. Accordingly, legally sufficient evidence supports the trial court's implied finding that with respect to 436 voters, mistakes by election clerks in failing to record information required by the election code made it impossible to determine whether those votes were legally cast and countable.

### G. Impossible to Determine True Outcome

Contestees argue that Contestants failed to meet their burden to present clear and

convincing evidence because Contestants failed to prove for whom all the challenged voters cast their votes. With regard to illegal votes, in some instances, a trial court may be able to determine (1) that illegal votes were cast, (2) the number of illegal votes cast, and (3) the candidate for whom those votes were cast. For example, a trial court may require a voter who casts an illegal vote to disclose the name of the candidate for whom that voter voted. TEX. ELEC.CODE ANN. § 221.009(a) (Vernon 2003). If all the voters who allegedly cast an illegal vote can be readily identified and brought in to testify before the trial court, such an inquiry can be easily made. In such a case, the trial court is directed to "subtract the vote from the official total for the candidate or side of the measure, as applicable." *Id.* § 221.011(a) (Vernon 2003).

For example, if Candidate A defeated Candidate B in an election by ten votes, and the trial court determines that eleven votes were illegally cast in favor of Candidate A, the trial court is instructed to subtract the eleven votes from Candidate A's election total. The code provides that if, after the subtraction, the trial court can ascertain the true outcome of the election, the trial court must declare the true outcome. *Id.* § 221.012(a) (Vernon 2003). Thus, in our hypothetical, Candidate B could be declared the true winner of the election.

In reality, election contests are not so cut and dry. The election code, however, recognizes that it may be impracticable or even impossible to determine for whom an illegal vote was cast. The election code does not *require* such an inquiry. Rather, the code provides that "if the tribunal finds that illegal votes were cast but cannot ascertain how the voters voted, the tribunal shall consider those votes in making its judgment." *Id.* § 221.011(b) (Vernon 2003). Although section 221.011 does not dictate exactly *how* those illegal votes should be considered, section 221.009 provides the answer: "[i]f the number of illegal votes is equal to or greater than the number of votes necessary to change the outcome of an election, the tribunal may declare the election void without attempting to determine how individual voters voted." *Id.* § 221.009(b) (Vernon 2003). In other words, if a trial court determines that illegal votes were cast and that the number of illegal votes equals or is greater than the margin of victory, the trial court can then declare the election void without ever inquiring as to the candidate for whom those illegal votes were cast. *See, e.g., Slusher,* 896 S.W.2d at 240; *Alvarez,* 844 S.W.2d at 242 (holding that the election code permits a trial court to determine whether the number of illegal votes cast exceeded contestee's margin of victory without determining for which candidate illegal votes were cast); *Kelley v. Scott,* 733 S.W.2d 312, 314 (Tex.App.—El Paso 1987, writ dism'd) (judgment declared void because one illegal vote was cast, which equaled the number of votes to change the outcome of the election, regardless of the candidate for whom the illegal voter casts her vote).

## H. Holding

We have found legally sufficient evidence to support a finding that 77 illegal votes were cast and that 436 votes were cast that may have been illegal, but which cannot be determined based on mistakes made by the election clerks. In this case, Contestants demonstrated that the margins of victory for Contestees were as follows: (1) Contestee Arturo Gonzalez, Jr. defeated Contestant Domingo Villarreal by 322 votes; and (2) Contestee Esperanza Ochoa defeated Contestant Elma Garza by 403 votes.

■ Although the number of illegal votes here does not account for the margin of victory of either contested race, the number of voters who may not have been eligible certainly does. The election code does not provide any guidance as to how a trial court should weigh a "mistake" by an election clerk. But given the importance of recording the true will of the voters, we believe that if a sufficient number of voters are rendered potentially ineligible by mistakes made during the recording process to account for the entire margin of victory, the trial court is within its discretion to declare the election void because it is impossible to determine the true outcome of the election.

■ Here, we believe it was not necessary for the trial court to determine that the challenged voters voted for Contestees to find that the outcome of the election was materially affected. *Alvarez*, 844 S.W.2d at 242; *Kelley*, 733 S.W.2d at 314. We also disagree that the fact that there were two contested races in this election changes the above-stated rules. The largest margin of victory in this case was 403 votes, and the irregularities in the election process accounted for more votes than the largest margin of victory. The trial court had before it legally sufficient evidence that undermined the outcome of the election to such an extent that the trial court properly declared the election void.

## IV. CONCLUSION

Contestees' first issue is overruled. Because we have found that the trial court

was presented with clear and convincing evidence that illegal votes were counted and that election judges made mistakes which materially affected and obscured the true outcome of the election, we need not address Contestees' second and third issues, for the resolution of those issues would not further affect the outcome of this appeal. TEX.R.APP. P. 47.1. The judgment of the trial court is affirmed.[18] The trial court is instructed to immediately prescribe a new election date in accordance with the election code. *See* TEX. ELEC.CODE ANN. § 231.007 (Vernon 2003).

---

18. We address herein pending motions in this appeal. We deny appellees' *motion to dismiss* the appeal, and dismiss as moot appellees' motion requesting that we order this appeal to take precedence and shorten the briefing deadlines, given that the Court has already granted the substance of the requested relief in conjunction with an earlier-filed motion. We dismiss as moot appellants' emergency motion to stay. We grant in part and deny in part appellees' motion requesting *en banc* submission, to shorten or deny rehearing, and to immediately issue mandate. Specifically, we deny appellees' motion for *en banc* submission (Vela, J., not participating), we grant appellees' motion to deny rehearing, and we are issuing the mandate with the judgment in this cause. *See* TEX.R.APP. P. 18.6, 49.4.