NUMBER 13-18-00563-CV

 COURT OF APPEALS

 THIRTEENTH DISTRICT OF TEXAS

 CORPUS CHRISTI - EDINBURG

ARMANDO O’CAÑA, Appellant,

 v.

NORBERTO ‘BETO’ SALINAS, Appellee.

 On appeal from the 93rd District Court
 of Hidalgo County, Texas.

 DISSENTING MEMORANDUM OPINION

Before Chief Justice Contreras and Justices Benavides and Hinojosa
 Dissenting Memorandum Opinion by Justice Hinojosa

 The majority sustains two issues asserted by Dr. Armando O’Caña, the contestee

below and appellant before us. It sustains O’Caña’s fifth issue, which contends that the

trial court abused its discretion in finding that O’Caña spoliated evidence and making a

spoliation inference, and his first issue, which contends that Norberto ‘Beto’ Salinas, the

contestant below and appellee before us, “failed to prove” that the number of illegal votes
was equal or greater than the number of necessary votes to change the election outcome.

 Fundamentally, the majority errs in sustaining O’Caña’s legal sufficiency challenge

by, among other things, reading the “clear and convincing” burden of proof Salinas bore

at trial to mean that Salinas was obligated to prove for whom each illegal vote was cast.

This is a review we would employ had the trial court rendered a judgment declaring

Salinas the winner. Instead, the trial court found that it could not determine the true

outcome of the election and ordered a new trial. I believe Salinas presented legally

sufficient evidence under a clear and convincing standard of this applicable finding.

Therefore, I respectfully dissent.

 I. BACKGROUND

 Salinas, the incumbent mayor, and O’Caña, a city councilmember, had twice

competed against each other in mayoral elections before the 2018 mayoral election. The

results of the May 5, 2018 general election provided:

 Early In- Mail-In Election Total
 Person Vote Ballot Day

 Salinas 2,138 234 713 3,085

 O’Caña 1,666 269 636 2,571

 Jamie Gutierrez 308 26 185 519

This tally necessitated a runoff between Salinas and O’Caña. The results of the June 9,

2018 runoff election provided:

 2
 Early In- Mail-In Election Total
 Person Vote Ballot Day

 Salinas 2,197 272 849 3,318

 O’Caña 2,189 393 893 3,475

 On July 18, 2018, Salinas filed his original petition for election contest. A bench

trial began on September 24, 2018. At trial, Salinas presented direct, circumstantial, and

expert evidence in support of his allegations that O’Caña’s 158 vote margin 1 resulted

from O’Caña’s campaign bribing voters and harvesting mail-in ballots.

A. Bribing Voters

 Samuel “Benji” Tijerina manages Top Gun Sprinters, a business that rents luxury

Mercedes Benz Sprinter vans for special occasions. Tijerina testified that, around the

time of the runoff election, Veronica O’Caña, O’Caña’s niece and proprietor of recently

formed VO Consulting, rented a van from Top Gun Sprinters for the sole purpose of

shuttling voters to the polls. The van’s windows had “limo tint,” which prevented

individuals outside from seeing inside unless their face was pressed against a window.

Veronica paid Tijerina the rental fee for the Sprinter van in cash during a brief encounter

in a parking lot.

 Samuel James Deckard, one of the voters ferried in a Sprinter van, testified about

his encounters with O’Caña’s campaign. Deckard’s trial testimony mirrored that of a pre-

trial affidavit he executed. In Deckard’s affidavit, which was admitted at trial, he avers:

 On 4/28/18 Benji Tijerina contacted me on Facebook Messenger.
 He asked me ‘Yo bro does any of your family wanna [sic] vote I will pay tem

 1 The parties concede and the majority acknowledges that Salinas received one improper vote,
moving O’Caña’s margin of victory from 157 to 158.
 3
 [sic] 10 bucks free transportation less then 3 mins’. I told him I would vote.

 On 5/1/18, Benji messaged me on Facebook Messenger with ‘U
 ready to vote bro.’ I said I was at city hall. He called me on Facebook
 Messenger and told me to meet them at Whataburger on Old 83 in Mission,
 Texas. I met them there. I left my car at Whataburger and got into their
 white Mercedes van. In the van, were people working the O’Cana
 campaign. These people were Benji Tijerina, Jesus Rodriguez (the driver),
 the brother to Jesus Rodriguez (I don’t know his name but was shown a
 picture of Charlie Rodriguez and identified him as the brother), and an older
 gentleman (I don’t know his name either but was shown a picture and
 identified him as Jesse Lopez). After they picked me up, they went and
 picked up a few more people . . . . They then drove us to Mission City Hall.
 The van stopped at the O’Cana campsite and Charlie Rodriguez and Jesus
 Lopez got out of the van. Cindy Pacheco then entered the van. I don’t
 know her by name, but was shown a picture of her and identified her. She
 coached us and told us that we needed to say that we needed assistance
 to vote and that we wanted Cindy to assist us. We then voted from inside
 the van and Cindy Pacheco assisted us in voting. Once we finished voting,
 Cindy then told the driver, Jesus Rodriguez, ‘Yes, they voted. You can pay
 them.’ They then dropped me off at my dad’s house . . . , the driver Jesus
 Rodriguez paid me $10.

 On 6/1/18, Jesus Rodriguez contacted me on Facebook Messenger
 stating ‘hey it’s benji’s cousin I was wondering if you an[d] your wife wanted
 to come vote again.’ I didn’t respond. He then showed up to my house in
 the van. He got off the van and came to my door and told me that this time
 they were paying $20 a vote and if I got 3 more votes they would pay me
 $60 to $80 more plus the $20 for each voter. Jesus Rodrigez then coached
 me to ask for assistance and ask for Lupita [O’Caña]. I didn’t remember
 Lupita’s name, but when shown a picture I was able to identify her. After
 we voted, they brought food to the [sic] told us if we know anyone else that
 wants to vote there is plenty of food. I asked them to take me to the store
 and they said they could not because it would have looked suspicious.
 They also told us to turn off our phones as soon as we got in the van. They
 then dropped me off at my dad’s house . . . . Jesus Rodriguez then gave
 the money to Charlie Rodriguez and then Charlie Rodriguez gave the
 money $20 to me.

 Dolores Gomez, Pamela Durr, and Arnulfo Navarro also testified that they were

paid by O’Caña’s campaign to vote for him. Durr and Gomez recalled that, like Deckard,

 4
they were ferried to the polls in a van, told to ask the poll workers for assistance, voted

with assistance of an O’Caña’s campaign worker in the privacy of the van, and were paid

for their vote. Durr identified Guadalupe “Lupita” O’Caña as the O’Caña campaign

worker who instructed her and two other voters in the van to request her assistance with

voting. After voting, Durr was paid $20. Gomez testified that Gloria Trevino, an O’Caña

campaign worker, repeatedly called her and then showed up at Gomez’s house

unannounced. Trevino transported Gomez to the polls. Gomez further testified that

Trevino paid her, her husband, her son, and her daughter-in-law $10 each to vote for

O’Caña. Navarro recalled that he and two of his brothers—Jaime and Ezequiel—were

each paid $20 for their vote by the O’Caña campaign.

B. Mail-In Ballot Harvesting

 Numerous witnesses, 2 including Emeterio Gutierrez, testified as to illegal mail-in

ballot harvesting by the O’Caña campaign. Gutierrez, an eighty-two year-old Mission

resident, resides at the Palms Plaza, an apartment complex for elderly individuals.

Gutierrez testified that Esmeralda Lara, an O’Caña campaign worker of questionable

allegiance, 3 presented him with a June 9, 2018 runoff mail-in ballot and obtained his

 2 Elizabeth “Liz” Hernandez and Lara also solicited, and then secretly assisted the following elderly
or disabled voters, all of whom testified, by collecting their mail-in ballots for the runoff election: Victoria
Salinas, Emma Barrera, Guadalupe Barrera, Rogelio Corpus, Leticia Cooley, Maria Canales, Emma Alaniz,
Guadalupe Perez, and Margarita Ramirez.

 3Lara testified that she worked for O’Caña’s campaign during the general election but secretly
switched allegiance and worked for Salinas’s campaign during the runoff election. However, after
O’Caña’s runoff victory, Liz Rodriguez posted a Facebook message stating, “Thank U Esmer Lara AND
Veronica O’Caña FOR LETTING [sic] BE A PART OF UR [sic] TEAM …. YES WE DID IT!!!!” Lara
responded, “My heart was full with u all and my prayers [sic] to. I new [sic] Lisa wouldn’t let me down. I
can always count on u. Now I have to celebrate with you all.”
 5
signature on a carrier envelope. The carrier envelope that Gutierrez signed, admitted by

the trial court, was mailed using a stamp that bears the image of a folded American flag

(folded flag stamp); it is marked “rec’d May 24, 2018.” The back of Gutierrez’s carrier

envelope contains an instruction before Gutierrez’s signature that provides, “Instructions

to Voter: Seal this envelope, and then sign your name in the space below. This

envelope must be sealed by the voter before it leaves the voter’s hands. Do not sign this

envelope unless the ballot has been marked by you or at your direction.” Gutierrez

testified that Lara took the ballot and accompanying envelopes before he had the

opportunity to mark the ballot or place a stamp on it. Moreover, Gutierrez observed Lara

visiting other residents at the Palms Plaza apartments even though neither she nor any

of her family members reside there.

 Carmen Ochoa testified that she encountered Lara exiting the office at La Posada

apartments, an assisted living facility for elderly individuals, while Ochoa paid her uncle’s

monthly rent. Ochoa saw Lara “with a bunch of ballots in her hand,” which at trial Ochoa

estimated to be approximately 200.

 Maribel Salinas, Salinas’s daughter, testified that she witnessed Lara walking

around the En Aqua Village, a senior housing community, with ballots in a shoulder bag.

 None of the carrier envelopes for the runoff election admitted at trial indicate that

Lara assisted voters with completing his or her ballot.

C. Expert Testimony

 Salinas retained George Korbel, an attorney, to provide expert opinions on election

analysis and Texas election law. Korbel’s opinions may be broadly classified into three

 6
categories: (1) an anomalous mayoral runoff election; (2) bribing voters by O’Caña’s

campaign; and (3) harvesting mail-in ballot by O’Caña’s campaign. To form his opinions

in this case, Korbel reviewed historical election data, interviewed witnesses, reviewed

affidavits and declarations, and listened to the in-court testimony.

 1. Anomalous Election

 Korbel concluded that the runoff election was anomalous in two ways. First, voter

participation increased from the general to the runoff election. Specifically, 618 more

votes were cast in the runoff election than in the general election. According to Korbel,

Mission had not experienced such an increase since 2004. In recent Hidalgo County

history, only two municipal elections evidenced increased turnout in a runoff election: the

City of Mercedes in 2011 and the City of Hidalgo in 2016. Korbel emphasized that the

2016 city of Hidalgo election led to individuals being arrested on suspicion of voter fraud.

Second, 665 mail-in ballots were cast in the run-off election. This figure represents a

136 increase in mail-in ballots over the general election and is the largest number of mail-

in ballots in any election in Mission history.

 Second, O’Caña performed better in the runoff in every category of votes.

O’Caña’s elevated performance was most pronounced in mail-in votes. He received 269

mail-in votes in the general election and then 393 mail-in votes in the runoff election, a 46

percent increase in mail-in ballots. On the other side of the ballot, Salinas received 234

mail-in votes in the general election and then 272 mail-in votes in the runoff election, a 16

percent increase in mail-in ballots.

 7
 2. Bribing Voters

 Korbel accepted as true the testimony of Deckard, Gomez, Durr, and Navarro that

they and their family members were bribed by the O’Caña campaign to vote for him and

were assisted by an O’Caña campaign worker to ensure that they all voted for him.

Korbel then matched Deckard, Gomez, Durr, and Navarro and their family members to

Guadalupe O’Caña, Laura Rodriguez, or Veronica O’Caña. These O’Caña campaign

workers ensured that Deckard, Gomez, Durr, and Navarro voted for O’Caña during the

runoff election. Using the combination voter forms, Korbel identified a total of forty-eight

voters who cast their ballots in close temporal proximity to Deckard, Gomez, Durr, and

Navarro and their family members.

 3. Mail-in Ballot Harvesting

 Korbel’s opinion regarding illegal mail-in ballot harvesting by the O’Caña campaign

is based upon the testimony of several witnesses, including Gutierrez, who testified that

their ballots were taken by O’Caña campaign workers, and whose ballots were mailed

using the folded flag stamp. He focused on the folded flag stamp and its presence on

carrier envelopes from the voters who testified that they voted with the assistance of

O’Caña campaign workers even though no assistance was noted on the carrier

envelopes. Korbel observed that, like the one affixed to the carrier envelope that Lara

took from Gutierrez, 357 carrier envelopes in the runoff election bore the same folded flag

stamp. Korbel testified that this particular folded flag stamp may be purchased in a roll

of 100 for $50 or in a book of 20 for $10. Stamps that come from a roll of 100 will have

perforations on the sides whereas stamps that come from a book of twenty will have

 8
perforations on the top and bottom as well as on the sides. Reviewing the 357 carrier

envelopes received by the election administrator during the runoff election for this

distinction, Korbel opined that 322 carrier envelopes were affixed with a folded flag stamp

that came from a roll. Further, only 19 of these envelopes were marked as receiving

voter assistance. Thus, 303 carrier envelopes which were mailed using a folded flag

stamp from a roll were not marked as receiving voter assistance.

 Korbel observed that, of the carrier envelopes mailed in the general election using

the folded flag stamp, 79 came from a roll and 41 came from a book. This yielded a ratio

of 65.8 percent roll stamps to 34.2 percent book stamps. He further observed that of the

carrier envelopes mailed in the runoff election using the folded flag stamp, 322 came from

a roll and 35 came from a book. This yielded a ratio of 90 percent roll stamps to 10

percent book stamps.

D. Judgment

 In the trial court’s final judgment, it declared that it could not ascertain the runoff

election’s true outcome and declared the election void. Later, it signed findings of fact

and conclusions of law. O’Caña did not seek additional findings, and he did not move

for a new trial. This accelerated appeal followed.

 II. DISCUSSION

 Following the order employed by the majority, I begin with O’Caña’s fifth issue

regarding the trial court’s finding of spoliation and making of an adverse inference before

addressing his first issue regarding his legal sufficiency challenge. 4

 4 I generally agree with the majority’s holding that rejects Salinas’s contention that O’Caña waived
 9
A. Spoliation

 Over the course of the trial, Salinas highlighted two instances in which he alleged

that O’Caña spoliated evidence. First, Salinas elicited testimony from O’Caña that, as a

matter of standard practice, O’Caña deleted communications between him and campaign

workers or supporters, including Jesus “Jesse” Rodriguez, Elizabeth Hernandez,

Esmeralda Lara, Veronica O’Caña, Laura Rodriguez, and Guadalupe “Lupita” O’Caña.

At trial, O’Caña admitted that records of those conversations were deleted or lost “before,

during, and after” Salinas’s lawsuit was filed. Nevertheless, before Salinas filed suit,

O’Caña was aware of investigative efforts into the runoff election. On direct examination

by Salinas’s counsel O’Caña testified:

 Q. After the lawsuit was filed—let me go back. Before the lawsuit was
 filed, were you aware that there were people asking—the
 constituents, your constituents, for affidavits or information
 concerning the election?

 A. Yes, I got a lot of phone calls from people.

 Q. Okay. And that would have been before the lawsuit was filed?

 A. No—yeah, before the lawsuit, yes, sir.

Second, Salinas contended that Veronica O’Caña and Guadalupe O’Caña evaded

service of subpoenas on ten different occasions. In legal conclusion 62, the trial court

writes:

all of his legal sufficiency challenge by not identifying specific factual findings. See Slip Mem. Op. 10. I
would not summarily overrule O’Caña’s legal sufficiency challenge because I am able to link, for the most
part, O’Caña’s legal sufficiency arguments to the specific findings made by the trial court. However, unlike
the majority, I will hold O’Caña to the rule that when a trial court issues fact findings and inadvertently omits
an essential element of a ground of recovery, the presumption of validity supplies by implication any omitted
elements that are supported by evidence. See TEX. R. CIV. P. 299; In re Estate of Miller, 446 S.W.3d 445,
450 (Tex. App.—Tyler 2014, no pet.).
 10
 In addition to the facts found, the court engages in an adverse
 inference against the contestee, Dr. Armando O’Caña, because of his
 destruction of presumptively adverse evidence in his control, akin to
 spoliation. He has a duty to preserve evidence when he knows, or
 reasonably should know, that [(a)] there is a substantial chance that a claim
 will be filed, and (b) that evidence in its possession or control will be
 potentially relevant to that claim. The Court finds Dr. O’Caña and/or his
 agents intentionally destroyed the correspondence between Dr. O’Caña
 and his campaign workers in order to conceal relevant evidence. The
 Court presumes this destroyed evidence supports a finding that at least 158
 votes were illegally cast.

 In O’Caña’s fifth issue, he complains that the trial court abused its discretion in

making legal conclusion 62. Salinas responds that O’Caña has waived his spoliation

complaint by not detailing how the adverse inference allegedly led to the rendition of an

improper judgment and by not requesting additional findings regarding his vicarious

liability for “agents.”

 Current Texas law governing a spoliation inference in a jury trial provides that a

“substantial chance of litigation” arises when “litigation is more than merely an abstract

possibility or unwarranted fear.” Brookshire Bros. v. Aldridge, 438 S.W.3d 9, 20 (Tex.

2014) (quoting Nat’l Tank Co. v. Brotherton, 851 S.W.2d 193, 204 (Tex. 1993)). The

majority finds “no evidence in the record that litigation was more than ‘an abstract

possibility’ prior to the time the election contest suit was filed; accordingly, O’Caña had

no duty to preserve communications prior to that time.” Slip Mem. Op., at 12. It does

not address whether Salinas’s inability to question Veronica O’Caña may serve as a basis

to support legal conclusion 62. I respectfully disagree with the majority’s holding.

Assuming, without deciding, that O’Caña adequately preserved his spoliation complaint,

I conclude that the trial court did not abuse its discretion in making a spoliation inference.

 11
 1. Deleted Communications

 The allegation of bribing voters is so serious that, if true, it is criminal. See TEX.

PENAL CODE ANN. § 36.02 (West, Westlaw through 2017 1st C.S.). Nevertheless, in this

civil election contest case, the trial court found as follows in factual findings 31–33:

 Dr. O’Caña also admitted he deleted his records before, during, and
 after this lawsuit was filed, including his communications with VO Consulting
 Services. He testified he had no receipts or other records showing what
 VO Consulting Services spent money on for his campaign. The owner of
 VO Consulting, Veronica O’Caña, could not be subpoenaed to testify at trial
 or via deposition, although 12 or more attempts were made.

 Veronica O’Caña rented a luxurious white Mercedes Benz van to use
 during the campaign for $500 cash. It was used to solicit prospective
 voters to be bribed to vote for O’Caña. Six voters testified they were
 solicited by O’Caña workers to vote for their candidate for $20 each, with
 an added bonus if they could bring more voters in to be bribed. They all
 testified they were picked up by a white Mercedes van and taken to the
 voting place, where a worker came on board and got permission to assist
 them in their voting. After they had voted with assistance, they were paid
 $20 each and taken home. One bribed voter testified that while in the van,
 he heard a campaign worker asking others on his cell phone to vote for a
 $20 bribe.

 The direct testimony of fact witnesses was that the O’Caña campaign
 bribed at least 18 voters.

On appeal, O’Caña has no quarrel with these findings. Katz v. Rodriguez, 563 S.W.2d

627, 631 (Tex. Civ. App.—Corpus Christi 1977, writ ref’d n.r.e.) (“Unless the trial court’s

findings of fact are challenged by point of error on appeal, . . . they are binding on the

appellate court.”). Because O’Caña does not challenge these factual findings, they are

binding. See id.

 The trial court found, among other things, that O’Caña deleted his communications

after Salinas filed suit. This alone supports a spoliation finding because litigation had

 12
already arisen contrary to the majority’s finding that litigation was a mere “abstract

possibility.” Cf. Aldridge, 438 S.W.3d at 20. Moreover, O’Caña admitted to knowing of

investigative efforts into the runoff election before Salinas’s suit was filed. 5 Given the

gravity of the allegation of bribing voters, the sanctity of our electoral process, the

pervasive tactics on the part of the O’Caña campaign—all of which the trial court believed

and O’Caña does not challenge—I would conclude that litigation was “more than merely

an abstract possibility or unwarranted fear” when O’Caña deleted his communications

with his campaign workers. Aldridge, 438 S.W.3d at 20. Accordingly, I believe that

O’Caña was under a duty to preserve communications for the period of time during which

the trial court believed that O’Caña’s campaign workers bribed voters.

 2. Salinas’s Inability to Question Veronica O’Caña

 On appeal, O’Caña complains that he should not bear a spoliation inference when

there was no evidence relating to whether he maintained an agency relationship with any

campaign worker. O’Caña references only one case, GTE S.W., Inc. v. Bruce, 998

S.W.2d 605, 617 (Tex. 1999), in support of his argument. I believe that legal conclusion

62 encompasses Salinas’s inability to serve a subpoena on Veronica O’Caña and obtain

campaign records that she should have possessed. According to the trial court’s

findings, Veronica O’Caña played a critical role in O’Caña’s campaign. In addition to the

findings referenced in the previous subsection, the trial court also found:

 In March 2018 Dr. O’Caña hired VO Consulting Services to handle
 his logistics and operations for his mayoral campaign. VO Consulting
 Services was a newly fashioned political operative firm run by Dr. O’Caña’s

 5 I note that Deckard’s affidavit was executed June 19, 2018, thirteen days after the June 6, 2018
runoff.
 13
 niece, Veronica O’Caña, which she formed on March 14, 2018. VO
 Consulting Services was in charge of public and digital outreach for the
 O’Caña campaign.

 Dr. O’Caña raised in excess of $38,000 for his mayoral race. He
 estimated that he spent 80% of that money on VO Consulting Services.
 Yet, Dr. O’Caña admitted that he had no receipts, expenditure reports, or
 any other record or document that would evidence the work that VO
 Consulting Services performed for his campaign.

(factual findings 29–30). The trial court also considered Salinas’s efforts in securing

Veronica O’Caña’s testimony:

 [SALINAS’S COUNSEL]: Your Honor, I’d like to address an issue that may
 affect the way we get started this morning.

 ....

 Okay. On Saturday, I had called [O’Caña’s
 lead counsel] asking him for the number of a
 colleague. It was a cordial conversation
 regarding a—a pending matter out of Cameron
 County, and I had called him asking him for his
 number. He had informed me about the
 situation with Mrs. Lara, and I took care of that
 situation with Mrs. Lara. We had not made that
 announcement yesterday. And yesterday, last
 night, I sent her a text that I needed her to be
 here at 10:30. She texted back, said, thank
 you, I will be there. Okay. I figured the first two
 witnesses we were going to start off with this
 morning was Mrs. Veronica O’Caña, V.O.
 Consulting, and Lupita O’Caña.

 ....

 So yesterday I got a phone call from [O’Caña’s
 lead counsel], my friend—he’s still my friend—
 at 8:09 in the morning. We were scheduled to
 start at 9:30. He asked me to please not to get
 these people served over at the funeral, which
 was something that I think under the common

 14
 ordinary rules of decency—

 [COURT]: Yes.

 [SALINAS’S COUNSEL]: —someone wouldn’t do.

 [COURT]: Right.

 [SALINAS’S COUNSEL]: However, we did plan to Skiptrace locate, and
 serve them somewhere else. I’m assuming
 they attended the—the funeral because based
 on his representations to me, they did. He
 said, don’t—don’t serve them at the funeral. I
 give you my word they will be here Tuesday
 morning.[6]

 [COURT]: Okay.

 [SALINAS’S COUNSEL]: I’ve been informed this morning that they’re not
 going to show up, and I understand part of the
 argument that he’s saying they’re not my
 witnesses; I don’t represent them; they’re out of
 my control. But the problem is that if we’re
 operating under these rules of honesty, honor,
 integrity, and when you give me your word, I’m
 assuming that somewhere down the road he
 had a conversation with them.

 [COURT]: So the witnesses are not going to be available
 here this morning?

 [SALINAS’S COUNSEL]: My understanding is and I think that [O’Caña’s
 lead counsel] can address that, he’s telling me
 that they will not appear this morning; and they
 were the first two people. I was going to call
 them out of order.

 6 At this point, I note two things. First, O’Caña’s counsel did not deny the representations made

by Salinas’s counsel regarding arranging for Veronica to appear at trial without the need to serve her with
a subpoena at her uncle’s funeral. I conclude these representations—made by officers of the court in the
heat of an expedited trial—constitute some evidence for the trial court to have find that O’Caña or his
attorney controlled Veronica to the extent that they had the ability to compel her presence at trial. Second,
the majority places much stock in a process server’s testimony. It errs by inverting the deemed finding
rule and not fully appreciating the trial’s prerogative regarding the credibility of witnesses.
 15
[COURT]: So you did not serve them at the funeral?

[SALINAS’S COUNSEL]: I did not serve them at the—at the funeral, and I
 want the Court to understand that there have
 been over 15 attempts made to serve this lady;
 specifically, Mrs. Veronica O’Caña. I have
 process servers that will testify to that. And the
 other day, the Court had suggested that
 [O’Caña’s lead counsel] make arrangements
 with these people to have them come in. I
 understand—and again, with all due respect to
 Mr. O’Caña and Dr. O’Caña as the Mayor, I’m—
 I’m not going to sink to that threshold that—that
 low and get somebody served at a funeral, but I
 think that somebody could have followed them.
 Somebody could have figured out where these
 people were staying at. We had somebody on
 standby that was willing to do that, but I took him
 at his word. He said—and again, you can put
 me under oath if you want to, Judge. That was
 the exact conversation. I have a lot of
 admiration for [O’Caña’s lead counsel].

 ....

[O’CAÑA’S COUNSEL]: Your Honor, I have not spoken to either one of
 these witnesses, okay? And so, I can’t tell you
 that they told me that they would be available
 today. I was informed that they believed that
 they would be available today. I was informed
 this morning that—that they will not be here
 today. That’s all. And—and I—when I spoke
 to [Salinas’s lead counsel], he specifically told
 me—he said, we were not going to attempt any
 service during the funeral or during any of that
 stuff.

 So they’re out a day—or half—a day and an
 half—I mean, an hour and a half, you know. All
 I can tell you, Your Honor, as an Officer of the
 Court, I have not spoken to them. I was just
 simply informed originally that they would try to
 bring them today. I was informed this morning

 16
 early in the morning that they would not be here.
 That’s all I have, Your Honor. I have no control
 over these witnesses. I haven’t talked to them.
 I don’t know where they’re at. I don’t have any
 information with respect to them other than that.

[SALINAS’S COUNSEL]: Your Honor, may I—may I respond briefly?
 And again, I don’t believe that [O’Caña’s lead
 counsel] would do—I took him for his word when
 he said it, and I believe he meant it when he said
 that to me. Again, I’m not trying to say that he’s
 playing tricks. However, I think the witnesses
 are, and we’re going to get to a point where if
 they become available in their case in any
 defense, I’m asking that the Court not allow
 them to testify, number one.

 And number two, that the Court consider giving
 itself its own instruction, considering the fact that
 in certain circumstances when witnesses are
 intentionally not making themselves available,
 that it’s an issue of consciousness of guilt,
 number one. And number two, it’s—it’s similar
 to the issue of spoliation. That the Court take
 whatever they would have said in the—in the
 worst light for them and—and in the light most
 favorable for the Contestant. I can tell the
 Court that I—again, I don’t believe that
 [O’Caña’s lead counsel]—and I say—I use his
 first name because I consider him to be my
 friend. I believe that when he told me on
 Monday morning—

[COURT]: All right. But you’re saying that if they are here
 for trial for [O’Caña’s] case, you wish to be able
 to take them out of order and take them when
 they are here; is that correct?

[SALINAS’S COUNSEL]: That’s correct. Either that or their—their
 testimony not—not be perpetuated. Because
 at this point, Judge, I don’t know how else to
 handle it.

 17
 [COURT]: I’ll let you take them out of order. If they show
 up, you can get them. I don’t know—I’m very
 sorry this happened. I’m very disappointed this
 happened. Representation by counsel that
 they—that not to serve and that they’d have
 them here. Anyway, I see the situation. I
 know you did not make the representation—you
 say you did not make the representation.

 Assuming without deciding that O’Caña is correct and that the trial court must have

found some agency relationship between O’Caña’s campaign and Veronica O’Caña, the

trial court’s unchallenged factual findings and any deemed findings that we must apply

given O’Caña’s failure to request additional findings, see TEX. R. CIV. P. 299; In re Estate

of Miller, 446 S.W.3d 445, 450 (Tex. App.—Tyler 2014, no pet.), support such a finding.

The trial court heard evidence that O’Caña paid V.O. Consulting, Veronica O’Caña’s

entity, approximately $31,200, representing 80% of the $39,000 O’Caña raised for the

mayoral election. Even setting aside the representations of counsel that concerned the

trial court, it blinks reality that O’Caña could pay such a sum to Veronica O’Caña, his

niece, and then be powerless to request her presence at trial four months later.

 3. Summary

 I would overrule O’Caña’s fifth issue. Further, I conclude that the trial court’s

spoliation inference is an additional factor to consider in O’Caña’s legal sufficiency

challenge.

B. Legal Sufficiency

 I address O’Caña’s first issue, challenging the legal sufficiency of the trial court’s

findings that his campaign bribed voters and harvested mail-in ballots, in the order

 18
presented by O’Caña and the majority.

 1. Standard of Review

 We review a trial court’s judgment in an election contest for an abuse of discretion.

Gonzalez v. Villarreal, 251 S.W.3d 763, 774–75 (Tex. App.—Corpus Christi 2008, pet.

dism’d). A trial court abuses its discretion if its decision lacks support “in the facts or

circumstances of the case or when it acts in an arbitrary and unreasonable manner

without references to guiding rules or principles of law.” Samlowski v. Wooten, 332

S.W.3d 404, 410 (Tex. 2011); see also Gonzalez, 251 S.W.3d at 774. However, a trial

court does not abuse its discretion if some evidence reasonably supports its decision,

even if the evidence is conflicting. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex.

2002).

 In a legal sufficiency review of the evidence to support a finding that must be

proved by clear and convincing evidence, we review all of the evidence in the light most

favorable to the verdict—or factual finding in this case—to ascertain whether a reasonable

factfinder could have formed a firm belief or conviction that the finding was true. Horizon

Health Corp. v. Acadia Healthcare Co., 520 S.W.3d 848, 866 (Tex. 2017). We assume

that the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder

could do so. Id. We disregard all evidence that a reasonable factfinder could have

disbelieved other than undisputed facts that do not support the finding. In re J.F.C., 96

S.W.3d 256, 266 (Tex. 2002).

 This case involves allegations of election fraud. The Texas Supreme Court has

noted that in cases of fraud, “[i]t is not often that any kind of evidence but circumstantial

 19
evidence can be procured.” Ford Motor Co. v. Castillo, 444 S.W.3d 616, 622 (Tex. 2014)

(quoting Thompson v. Shannon, 9 Tex. 536, 538 (1853)). Moreover, circumstantial

evidence must be evaluated in light of all the known circumstances, not merely in

isolation. City of Keller v. Wilson, 168 S.W.3d 802, 813–14 (Tex. 2005). If

circumstantial evidence, when viewed in light of all the known circumstances, is equally

consistent with either of two facts, then neither fact may be inferred. Id. at 813–14. But

where the circumstantial evidence is not equally consistent with either of two facts, and

the inference drawn by the factfinder is within the “zone of reasonable disagreement,” a

reviewing court cannot substitute its judgment for that of the trier-of-fact. Id. at 822.

 2. Applicable Law

 “The tribunal hearing an election contest shall attempt to ascertain whether the

outcome of the contested election, as shown by the final canvass, is not the true outcome

because illegal votes were counted.” TEX. ELEC. CODE ANN. § 221.003(a)(1) (West,

Westlaw through 2017 1st C.S.). Section 221.009(b) of the election code provides, “If

the number of illegal votes is equal to or greater than the number of votes necessary to

change the outcome of an election, the tribunal may declare the election void without

attempting to determine how individual voters voted.” Id. § 221.009(b) (West, Westlaw

through 2017 1st C.S.).

 Generally, possession of an official ballot or carrier envelope belonging to another

is a crime, and mailing another’s ballot without following the proper procedures results in

 20
the ballot being illegal. Id. §§ 86.006(a)–(h), 7 § 86.010(c)–(e), 8 § 86.0051(b) 9 (West,

 7 Section 86.006(a)–(h) of the election code provides:

 (a) A marked ballot voted under this chapter must be returned to the early voting clerk
 in the official carrier envelope. The carrier envelope may be delivered in another
 envelope and must be transported and delivered only by:

 (1) mail;

 (2) common or contract carrier; or

 (3) subject to Subsection (a-1), in-person delivery by the voter who voted the
 ballot.

 (a-1) The voter may deliver a marked ballot in person to the early voting clerk’s office
 only while the polls are open on election day. A voter who delivers a marked ballot
 in person must present an acceptable form of identification described by Section
 63.0101.

 (b) Except as provided by Subsection (c), a carrier envelope may not be returned in
 an envelope or package containing another carrier envelope.

 (c) The carrier envelopes of persons who are registered to vote at the same address
 may be returned in the same envelope or package.

 (d) Each carrier envelope that is delivered by a common or contract carrier must be
 accompanied by an individual delivery receipt for that particular carrier envelope
 that indicates the name and residence address of the individual who actually
 delivered the envelope to the carrier and the date, hour, and address at which the
 carrier envelope was received by the carrier. A delivery of carrier envelopes is
 prohibited by a common or contract carrier if the delivery originates from the
 address of:

 (1) an office of a political party or a candidate in the election;

 (2) a candidate in the election unless the address is the residence of the early
 voter;

 (3) a specific-purpose or general-purpose political committee involved in the
 election; or

 (4) an entity that requested that the election be held, unless the delivery is a
 forwarding to the early voting clerk.

 (e) Carrier envelopes may not be collected and stored at another location for
 subsequent delivery to the early voting clerk. The secretary of state shall
 prescribe appropriate procedures to implement this subsection and to provide
 accountability for the delivery of the carrier envelopes from the voting place to the
 early voting clerk.

 21
(f) A person commits an offense if the person knowingly possesses an official ballot
 or official carrier envelope provided under this code to another. Unless the person
 possessed the ballot or carrier envelope with intent to defraud the voter or the
 election authority, this subsection does not apply to a person who, on the date of
 the offense, was:

 (1) related to the voter within the second degree by affinity or the third degree
 by consanguinity, as determined under Subchapter B, Chapter 573,
 Government Code;1

 (2) physically living in the same dwelling as the voter;

 (3) an early voting clerk or a deputy early voting clerk;

 (4) a person who possesses a ballot or carrier envelope solely for the purpose
 of lawfully assisting a voter who was eligible for assistance under Section
 86.010 and complied fully with:

 (A) Section 86.010; and

 (B) Section 86.0051, if assistance was provided in order to
 deposit the envelope in the mail or with a common or
 contract carrier;

 (5) an employee of the United States Postal Service working in the normal
 course of the employee's authorized duties; or

 (6) a common or contract carrier working in the normal course of the carrier's
 authorized duties if the official ballot is sealed in an official carrier envelope
 that is accompanied by an individual delivery receipt for that particular
 carrier envelope.

(g) An offense under Subsection (f) is a Class A misdemeanor unless the defendant
 possessed the ballot or carrier envelope without the request of the voter, in which
 case it is a felony of the third degree. If conduct that constitutes an offense under
 this section also constitutes an offense under any other law, the actor may be
 prosecuted under this section, the other law, or both.

(g-1) An offense under Subsection (g) is increased to the next higher category of offense
 if it is shown on the trial of an offense under this section that:

 (1) the defendant was previously convicted of an offense under this code;

 (2) the offense involved an individual 65 years of age or older; or

 (3) the defendant committed another offense under this section in the same
 election.

(h) A ballot returned in violation of this section may not be counted. If the early voting
 clerk determines that the ballot was returned in violation of this section, the clerk
 shall make a notation on the carrier envelope and treat it as a ballot not timely
 22
Westlaw through 2017 1st C.S.).

 O’Caña’s legal sufficiency challenge is intertwined with his assertion that Korbel’s

opinions are unreliable. We review a trial court’s rulings on the admissibility of evidence

for an abuse of discretion, including rulings on the reliability of expert testimony.

Whirlpool Corp. v. Camacho, 298 S.W.3d 631, 638 (Tex. 2009); Gammill v. Jack Williams

Chevrolet, Inc., 972 S.W.2d 713, 727 (Tex. 1998). “Admission of expert testimony that

does not meet the reliability requirement is an abuse of discretion.” Cooper Tire &

 returned in accordance with Section 86.011(c). If the ballot is returned before the
 end of the period for early voting by personal appearance, the early voting clerk
 shall promptly mail or otherwise deliver to the voter a written notice informing the
 voter that:

 (1) the voter’s ballot will not be counted because of a violation of this code; and
 (2) the voter may vote if otherwise eligible at an early voting polling place or the
 election day precinct polling place on presentation of the notice.

 TEX. ELEC. CODE ANN. § 86.006(a)–(h) (West, Westlaw through 2017 1st C.S.).

 8 Section 86.010(c)–(e) of the election code provides:

 (c) The person assisting the voter must sign a written oath prescribed by Section
 64.034 that is part of the certificate on the official carrier envelope.

 (d) If a voter is assisted in violation of this section, the voter's ballot may not be
 counted.

 (e) A person who assists a voter to prepare a ballot to be voted by mail shall enter the
 person's signature, printed name, and residence address on the official carrier
 envelope of the voter.

 Id. § 86.010(c)–(e) (West, Westlaw through 2017 1st C.S.).
 9 Section 86.0051(b)of the election code provides:

 A person other than the voter who assists a voter by depositing the carrier envelope in the
 mail or with a common or contract carrier or who obtains the carrier envelope for that
 purpose must provide the person’s signature, printed name, and residence address on the
 reverse side of the envelope.

 Id. § 86.0051(b) (West, Westlaw through 2017 1st C.S.).
 23
Rubber Co. v. Mendez, 204 S.W.3d 797, 800 (Tex. 2006) (citation omitted). If a litigant

has properly preserved a no-evidence challenge, “we independently consider whether the

evidence at trial would enable reasonable and fair-minded jurors to reach the verdict.”

Whirlpool Corp., 298 S.W.3d at 638. This review “encompasses the entire record,

including contrary evidence tending to show the expert opinion is incompetent or

unreliable.” Id.; see also City of Keller, 168 S.W.3d at 810 (stating that no evidence

exists if “the court is barred by rules of law or of evidence from giving weight to the only

evidence offered to prove a vital fact”).

 O’Caña’s argument also labors, at least in part, under a belief that Korbel’s

testimony must meet some or all of the Robinson factors. See E.I. du Pont de Nemours

& Co. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995) (setting forth six factors courts “may

consider” in determining whether expert testimony is admissible). But in TXI

Transportation Co. v. Hughes, 306 S.W.3d 230, 235 (Tex. 2010), the Texas Supreme

Court addressed a similar notion involving accident reconstruction experts, writing that it

has:

 suggested several factors to consider when assessing the admissibility of
 expert testimony under Rule 702. We have emphasized, however, that
 these factors are non-exclusive, and that they do not fit every scenario.
 Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726 (Tex. 1998).
 They are particularly difficult to apply in vehicular accident cases involving
 accident reconstruction testimony. Ford Motor Co. v. Ledesma, 242
 S.W.3d 32, 39 (Tex. 2007) (citing Mendez, 204 S.W.3d at 802 (Tex.2006));
 see also Gammill, 972 S.W.2d at 727. Nevertheless, the court, as
 gatekeeper, “must determine how the reliability of particular testimony is to
 be assessed.” Gammill, 972 S.W.2d at 726. Rather than focus entirely
 on the reliability of the underlying technique used to generate the
 challenged opinion, as in Robinson, we have found it appropriate in cases
 like this to analyze whether the expert's opinion actually fits the facts of the

 24
 case. Volkswagen of Am., Inc. v. Ramirez, 159 S.W.3d 897, 904–05 (Tex.
 2004). In other words, we determine whether there are any significant
 analytical gaps in the expert’s opinion that undermine its reliability. Id.

Hughes, 306 S.W.3d at 235.

 3. Analysis

 a. Bribed Voters

 With regard to the bribed voters, the trial court found:

 The direct testimony of fact witnesses was that the O’Caña campaign
 bribed at least 18 voters.

 George Korbel, [Salinas’s] expert viewed the list of assisted voters
 finding the names of the bribed voters who testified to such. He found at
 least 48 voters who had most likely been bribed, comparing the closeness
 of times of voting and the names of those giving assistance to those who
 had testified as being bribed that day.

 Mr. Korbel, as part of his election analysis, reviewed the testimony,
 the affidavits, the election materials, and his interviews to formulate his
 opinion on the vote bribery at issue in this cause. He was present during
 the entirety of the trial hearing all testimony.

 The Court finds Mr. Korbel’s expert opinions to be relevant, reliable,
 and based on sufficient facts and data. The methodology Mr. Korbel used
 to form his opinions, including reviewing historical election data, conducting
 interviews, and statistical analysis, is testable and backed by sound
 methods used by election analysts in judicial and non-judicial inquiries.
 The Court finds that at least 48 voters were bribed to vote for Dr. Armando
 O’Caña during the June run-off election, but many more voters were likely
 bribed.

(factual findings 33–36). The majority sustains O’Caña’s legal sufficiency challenge to

Korbel’s testimony that forty-eight voters assisted by Guadalupe O’Caña, Laura

Rodriguez, and Veronica O’Caña were very likely bribed by concluding that Korbel’s

testimony is conclusory. Specifically, the majority writes:

 25
 . . . Korbel’s testimony regarding the “very likely” quantity of
 additional bribed votes does not meet the exacting standard of “clear and
 convincing.” Korbel stated that 48 early voters cast their ballots around the
 same time as the five voters who testified they were paid, and were assisted
 by the same people as those five voters. Korbel opined that all 48 voters
 were also paid; but he based that opinion on an “assumption” that “if you
 pay one . . . you’re going to pay everybody and that’s the way the world
 works.” He did not explain the underlying basis for this assumption, and
 though Korbel is undoubtedly an expert in election analyses concerning
 racially polarized voting, there is nothing in his background that would
 indicate an expertise in vote bribery. His testimony that “if you pay
 one . . . you’re going to pay everybody” is unsupported by any factual basis
 or underlying reasoning. This conclusory testimony is not probative.

Slip Mem. Op., at 16 (citation omitted).

 I respectfully disagree with this analysis. In my assessment, the majority errs in

two ways by dismissing Korbel’s “assumption” that Guadalupe O’Caña, Laura Rodriguez,

and Veronica O’Caña very likely bribed all forty-eight voters who cast their ballots in close

temporal proximity to the votes cast with their assistance by Deckard, Durr, Gomez, and

Navarro. First, the applicable standard of review does not require that every opinion,

assumption, or inference meet a “clear and convincing” standard. Instead, we are tasked

with reviewing all of the evidence in the light most favorable to the factual finding to

ascertain whether a reasonable factfinder could have formed a firm belief or conviction

that the finding was true. See Horizon Health Corp., 520 S.W.3d at 866. Second, the

majority seemingly uses its belief that Korbel is unqualified to provide an expert opinion

on “vote bribery” to discount Korbel’s “assumption.”10 Linking the temporal proximity of

ballots cast with the assistance of campaign workers accused of bribing strangers with

 10I note that in discounting Korbel’s “assumption” the majority also does not address O’Caña’s
second issue, in which he contends that the trial court abused its discretion in admitting Korbel’s testimony.
 26
those of other ballots cast with the assistance of the same campaign workers is not the

stuff of peer-reviewed publications. Cf.. Robinson, 923 S.W.2d at 557. Instead, I

believe that Korbel, as an expert in voting rights and election analysis, is akin to an

accident reconstruction expert in that rather than focusing entirely on the reliability of the

underlying technique used to generate Korbel’s opinion, as in Robinson, it is appropriate

in cases like this to analyze whether Korbel’s opinion actually fits the facts of the case.

See Hughes, 306 S.W.3d at 235. By not recognizing that Korbel’s expertise in election

analysis fits the facts of this case, the majority probes for a type of “factual basis or

underlying reasoning” that the law governing the legal sufficiency of expert testimony

does not demand from him. See Horizon Health Corp., 520 S.W.3d at 866.

 Instead, I conclude that Korbel’s opinion actually fits the facts of this case and there

are no analytical gaps in it. See id. Korbel’s “assumption” that Guadalupe O’Caña,

Laura Rodriguez, and Veronica O’Caña very likely bribed those voters who they assisted

in close temporal proximity to assisting and bribing Deckard, Durr, Gomez, and Navarro

is reasonable. Indeed, most factfinders would find it implausible that these O’Caña

campaign workers solemnly refrained from such conduct with all other voters. See City

of Keller, 168 S.W.3d at 813–14 (explaining the equal inference rule). There is no

indication that the bribe offers extended to those O’Caña voters who testified was limited

or clandestine. To the contrary, O’Caña campaign workers invariably bribed voters in

groups and asked if these voters knew others who were willing to sell their vote.

Therefore, I conclude that there was legally sufficient evidence that forty-eight individuals

were bribed into voting for O’Caña.

 27
 b. Harvested Mail-in Ballots

 As relevant to the harvested mail-in ballots, the trial court found:

 On two occasions witnesses testified of seeing two particular O’Caña
 workers with many mail in ballots each. One witness testifying to a stack
 of ballots six inches high and another a “large bag full.”

 ....

 I find clear and convincing evidence that the number of illegally
 handled mail in ballots by members of the O’Caña campaign is in excess of
 150 although it is impossible to know the exact number.

(factual findings 41 and 55). The majority discounts Ochoa’s testimony that she saw

Lara with 200 mail-in ballots as circumstantial and a guess. 11 I believe that the majority

misapprehends the record.

 Before trial, Ochoa executed an affidavit that provides:

 I[,] Carmen Ochoa[,] arrived at the front office to pay my rent. The
 office lady was tied up talking to a short lady with a big build. They were
 talking about the run off elections. I then saw the office lady give a hand
 full of mail in ballots to that short chubby lady. It looked wired [sic] since
 she did not live there and that there were way to [sic] many ballots. After I
 looked at the pictures[,] I picked out Esmer Lara out. [sic] If I was to
 estimate how many ballots were taken[,] I’d say 20 to 40.

At trial, Salinas’s counsel asked and Ochoa answered:

 Q. And a little while ago, Ms. Ochoa, you were using your hands to
 describe—for the record, nobody has seen what you’re testifying to
 so can you tell us, can you show us with your hands what you recall
 seeing as far as the size, using your hands. Can you hold that over
 real quick?

 A. The ballots like this.

 11 The majority notes that Lara testified she “switched” to Salinas’s camp during the runoff election.
The trial judge, as the factfinder in this case, was entitled to believe all, some, or none of Lara’s testimony
if a reasonable juror could. See City of Keller v. Wilson, 168 S.W.3d 802, 819–20 (Tex. 2005).
 28
 Q. Can you hold your hands there right now? How many inches more
 or less in your opinion would that be?

 A. I do not understand about that.

 Q. Okay.

 Q. Anybody have a measuring tape?

 Q. Would it be fair to say—do you know what a foot is?

 A. Yes, more or less.

 A. More.

 A. More.

 Q. Okay. So is it your opinion that what you saw was more or less a
 stack of ballots that measured up to about a foot?

 A. I do not understand about that but I figure 200, around 200, more or
 less.

 Q. 200 ballots?

 A. Well, that’s what I see, that’s what I saw.

On cross examination, O’Caña’s counsel asked and Ochoa answered:

 Q. So, when you testified earlier that you saw—the only thing you saw
 was Ms. Lara walking out of the office with a bunch of ballots in her
 hand, that was not what you originally swore to, right?

 A. Well, I say what I spoke. I said it.

 Q. And when you—and when you testified that there was 200 ballots in
 the possession of Ms. Lara, that’s not what you swore to before,
 right?

 A. Well, what I say is like this, I only kind of guess.

 Q. Well, you, on your own volunteered, did you not, that there were 200
 ballots, right?

 29
 A. Well, I did—

 [SALINAS’S COUNSEL]:: Your Honor—

 A. —it is—

 [SALINAS’S COUNSEL]: —and for the record, she’s using her hands.
 Since we don’t have a record of it, she’s—

 [O’CAÑA COUNSEL]: Your Honor, that doesn’t matter what he wants.
 Is there an objection? Is there an objection?

 [COURT]: Wait a minute.

 [SALINAS’S COUNSEL]: What I’m saying is that it’s nonverbal
 communication that’s important for the record.

 [O’CAÑA COUNSEL]: Your Honor, it doesn’t matter what he says, it’s
 not—

 [SALINAS’S COUNSEL]: I’m not objecting to what he’s doing—

 [O’CAÑA COUNSEL]: Well, what is he doing? He’s interrupting my
 cross-examination.

 [COURT]: I have—I have observed how she held her
 hands.

(Emphasis added).

 Under the applicable standard of review, we are to assume that the trial court

resolved the discrepancy between Ochoa’s affidavit averment regarding a range of twenty

to forty and live, in-court testimony regarding approximately 200 mail-in ballots in favor of

its judgment if a reasonable factfinder could do so. See Horizon Health Corp., 520

S.W.3d at 866. Even in the cold record, Ochoa ascribes her “guess” to the “20 to 40”

range that she stated in her affidavit. Accordingly, on Ochoa’s testimony alone the trial

 30
court may have reasonably determined that Lara was holding 200 mail-in ballots.

 Next, the majority concludes Korbel’s opinion that as many as 303 mail-in ballots

were harvested by the O’Caña campaign is legally insufficient because it is founded on

layers of inferences and assumptions. Specifically, the majority writes:

 In particular, [Korbel] seems to assume that all of the mail-in voters in
 Mission are “poor” and therefore could not afford a $50 roll of stamps. This
 assumption was critical to Korbel’s inference that some or all of the
 envelopes bearing the folded-flag roll stamp were subject to illegal
 harvesting. Without this assumption, there would be no reason to believe
 that an envelope bearing a particular type of stamp is any more or less likely
 to have been cast due to illegal harvesting.

Slip Mem. Op., at 17. The majority errs by focusing on Korbel’s comments regarding the

area’s low-income population.

 Korbel’s opinion is based upon the testimony of several witnesses. Gutierrez

testified that Lara took his carrier envelope that he had signed before he had the

opportunity to mark his ballot. When Gutierrez’s carrier envelope arrived at the election

administrator’s office, there was no indication that he had received assistance in voting

from anyone, including Lara. Further, Korbel identified Gutierrez’s ballot, admitted at

trial, as being among those that were mailed using the folded flag stamp from a $50 roll.

These are two points that O’Caña does not assail and the majority does not address.

Additionally, Hernandez and Lara also solicited and then secretly assisted the following

elderly or disabled voters, all of whom testified, by collecting their mail-in ballots for the

runoff election: Victoria Salinas, Emma Barrera, Guadalupe Barrera, Rogelio Corpus,

Leticia Cooley, Maria Canales, Emma Alaniz, Guadalupe Perez, and Margarita

 31
Ramirez. 12 These assisted voters did not mail their ballots or place a stamp on the

carrier envelopes. Additionally, their carrier envelopes, which were admitted at trial, did

not indicate Hernandez’s or Lara’s assistance, and their carrier envelopes were all

stamped with a folded flag stamp that came from a $50 roll.

 I also note that O’Caña admitted to purchasing a roll of stamps during the relevant

period. He, however, denied providing these stamps to campaign workers. As with all

other testimony, it was the trial court’s prerogative to assess O’Caña’s credibility. See

City of Keller, 168 S.W.3d at 819–20.

 The majority’s legal sufficiency analysis finishes by tying Korbel to a strawman with

speculation—an argument O’Caña never made. The majority posits that Korbel’s

opinion flows from a false dichotomy, writing:

 Korbel seems to have entertained only two possibilities for why that may
 have occurred: (1) each of the 303 voters individually and independently
 purchased a $50 roll of identical stamps,[13] or (2) rampant fraud occurred.

Slip Mem. Op., at 19 (emphasis added). Korbel never opined that 303 voters individually

and independently purchased a $50 roll of identical stamps. Instead, that appears to be

the majority’s assumption for how carrier envelopes may have been coupled with a folded

flag stamp. See id. But, the possibility of perfectly legal mail-in ballots does not explain

how 303 carrier envelopes were mailed using the identical stamp. Rather than

speculating about how perfectly legal mail-in ballots may have been returned to the

 12 For brevity, I will not recount each of these voter’s in-court testimony.
 13I note that Korbel did not testify that “no Mission voters are capable of affording a $50 roll of
stamps,” as the majority writes. Instead, his opinion was that those Mission voters who voted by mail
tended not to purchase stamps in $50 increments.
 32
election administrator, as the majority does, I have reviewed the presence of these 303

carrier envelope in light of the testimony that the O’Caña campaign rented in cash a

Sprinter van with tinted windows from an individual in a parking lot. And that the O’Caña

campaign used this van to ferry voters to the polls, instruct them to ask the poll workers

for assistance and then preceded to “assist” these voters in the privacy of the van, and

then paid them for their votes afterwards.

 Lastly, the majority contends that “the dearth of direct evidence” necessitates that

we look to “[t]he apparently uncontested fact that a plurality of the illegally harvested

ballots proven at trial were actually cast for Salinas” in conducting our legal sufficiency

review. Again, the majority is making O’Caña’s argument for him and turning a blind eye

toward of wealth of evidence supporting the trial court’s findings.

 The majority’s implicit assumption that 357 voters, including those mentioned

above, each individually and independently purchased a $50 roll of identical stamps is

implausible. See id. at 802, 813–14 (explaining the equal inference rule). And, it is

immaterial to our legal sufficiency analysis that there was some evidence that the Salinas

campaign may have also engaged in improper campaign conduct. See In re J.F.C., 96

S.W.3d at 266.

 4. Summary

 After considering the entire record and the spoliation inference that the trial court

made within its discretion, I conclude that there is legally sufficient evidence to support

the trial court’s finding, by clear and convincing evidence, that the number of illegal votes

is equal to or greater than the number of votes necessary to change the outcome of the

 33
election. See TEX. ELEC. CODE ANN. § 221.012(b). Further, the trial court could have

formed a firm belief or conviction in this finding based only on the evidence adduced at

trial. See In re J.F.C., 96 S.W.3d at 266. Therefore, I conclude that the trial court did

not abuse its discretion in finding that it could not determine the true outcome of the

election and in rendering a judgment voiding the election results. See McCurry, 259

S.W.3d at 372. I would overrule O’Caña’s first issue.

 III. CONCLUSION

 As with the majority, I am confident that the criminal justice system is available to

prosecute any potential conduct that violates the Texas Penal Code, Texas Election

Code, and applicable federal law. But the criminal justice system’s primary goal is not

to remedy the effect of illegal votes. Unlike the majority, I do not believe that the civil

justice system is powerless to remedy the tainted mayoral runoff election that is the

subject of this appeal. The legislature has prescribed a remedy by allowing contestants

such as Salinas to petition a trial court and present evidence of alleged improprieties.

The heightened evidentiary standard of “clear and convincing evidence” mandated by the

legislature rests upon a body of common law rules that recognizes allegations of fraud

are generally proven with circumstantial evidence, 14 requires a review of the totality of

the evidence and an avoidance of isolating evidence, 15 and accords deference to

assumptions and inferences that are reasonable. 16 See Acker v. Tex. Water Comm’n,

 14 Ford Motor Co. v. Castillo, 444 S.W.3d 616, 622 (Tex. 2014) (quoting Thompson v. Shannon, 9
Tex. 536, 538 (1853)).
 15 Horizon Health Corp. v. Acadia Healthcare Co., 520 S.W.3d 848, 866 (Tex. 2017).

 16 City of Keller v. Wilson, 168 S.W.3d 802, 813–14 (Tex. 2005).
 34
790 S.W.2d 299, 301 (Tex. 1990) (providing that a statute is presumed to have been

enacted by the legislature with complete knowledge of the existing law and with reference

to it). These common law rules also render the notion that Salinas may have benefited

from irregularities, a point emphasized by the majority, as mostly irrelevant to our legal

sufficiency review. I respectfully submit that the majority fails to appreciate and apply

these common law rules. 17 The evidence in this case, as reviewed under these common

law rules, meets the heightened evidentiary standard of “clear and convincing evidence.”

 In closing, the majority puts forward that its holding safeguards a voter’s right to

have his or her lawful vote counted. I believe that it does not. By reversing the trial

court’s judgment, the majority allows lawful votes to be diluted and may dissuade voters

from participating in the electoral process.

 For all of these reasons, I would modify the trial court’s judgment to delete the

provision ordering a new runoff election within sixty days of November 6, 2018, the

judgment’s date, because that date has passed, affirm the judgment as modified, and

remand with instructions to set a new runoff election date. Because the majority does

not do so, I respectfully dissent.

 17 The majority faults my reliance on these common law rules, noting that they are not derived from
election contest cases. Instead, the majority posits that the legislature’s requirement for a heightened
standard in election contests reflects “its unmistakable intent that election contests be treated differently.”
See Slip Mem. Op., at 21, n.16. If the majority believed this to be true in all respects, I would expect it to
limit its cited authority to only election law cases. It does not. More importantly, I do not believe the
legislature’s prescription for a heightened standard is in any way inconsistent with the long-standing
common law rules I cite in this dissent. Cf. In re E.N.C., 384 S.W.3d 796, 807 (Tex. 2012) (applying the
existing common-law Holley factors in relation to statutory requirement that a best-interest finding in
termination cases be established by clear and convincing evidence). Neither do I believe that the pertinent
statutory framework implicitly contains such a restriction. See Lee v. City of Houston, 807 S.W.2d 290,
294–95 (Tex. 1991) (“A court may not judicially amend a statute and add words that are not implicitly
contained in the language of the statute.”).
 35
 LETICIA HINOJOSA
 Justice
Delivered and filed the
29th day of March, 2019.

 36